**Jacqueline P. TAYLOR, et al., Appellants,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION and Ricki Helfer, Chairman, FDIC, Appellees.**

No. 96–5267.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 17, 1997.

Decided Dec. 23, 1997.

---

Robert C. Seldon, Washington, DC, argued the cause for appellants. With him on the brief was Joanne Royce.

Marina Utgoff Braswell, Assistant U.S. Attorney, Washington, DC, argued the cause for appellees. With her on the brief was Mary Lou Leary, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney. John D. Bates, Assistant U.S. Attorney, entered an appearance.

Before: WILLIAMS, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Concurring opinion filed by Circuit Judge ROGERS.

STEPHEN F. WILLIAMS, Circuit Judge:

Three former employees of the Resolution Trust Corporation ("RTC") have sued the

corporation, claiming that it retaliated against them for making protected disclosures, in violation of the RTC Whistleblower Act, 12 U.S.C. § 1441a(q), and the First Amendment. When the RTC's statutory life expired, its statutory successor, the Federal Deposit Insurance Corporation ("FDIC"), was substituted as defendant. On the FDIC's motion for dismissal or, alternatively, for summary judgment, the district court dismissed the statutory counts of the complaint under Rule 12(b)(6) and entered summary judgment for the defendant on the constitutional counts. This appeal followed. Except to the extent that we vacate for want of jurisdiction, we affirm.

\* \* \*

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 created the RTC to manage and resolve savings and loan cases. 12 U.S.C. § 1441a(b). With the exception of its CEO, the RTC had no employees of its own; it drew them instead from the FDIC. 12 U.S.C. § 1441a(b)(8). In 1991, appellants Bruce Pederson and Jacqueline Taylor were senior attorneys in the RTC's Western Regional Office in Denver, attached to the Professional Liability Section ("PLS"), whose assigned task was to bring suits against disloyal fiduciaries of failed savings and loans. The third appellant, Juan Luis Burgos–Gandia, occupied a different office (Dallas) and served in a different capacity. A fourth ex-employee plaintiff, Richard Dunn, is not a party to this appeal but will be conspicuous by his absence.

Pederson and Taylor's conflict with the RTC began in 1992, when they took issue with a reorganization of their office initiated in anticipation of the RTC's 1995 statutory sunset. See 12 U.S.C. § 1441a(m)(1). In March of 1992, Pederson circulated a memo to RTC management detailing his concerns that the reorganization would hinder the PLS. Joint Appendix ("J.A.") 786. To no avail; the reorganization went on as planned and on May 11 of 1992, he and Taylor were selected for return to the FDIC as part of the "put-back" program.[1] In anticipation,

they were assigned to a "Special Projects Unit" which occupied a different Denver office and, according to Pederson and Taylor, constituted a professional purgatory—they were denied meaningful work, support staff, computer links and supplies, and they were ostracized by former colleagues afraid to be seen with them. J.A. 754–55.

Having achieved little with his internal memo, Pederson changed forum and theme: During the summer and into the fall of 1992, he and Taylor communicated with the General Accounting Office ("GAO") and testified before the Senate Banking Committee, alleging now that the reorganization was concocted to protect well-connected malefactors by hamstringing their PLS pursuers. The GAO and RTC's Inspector General investigated; reports issued in the summer of 1993 found no illicit cronyism, but concluded that the reorganization had been handled poorly.

The put-back program was canceled in July 1992, but Pederson and Taylor remained in their Special Projects exile. There, they contend, they were subject to continual retaliation and discrimination until their May 1995 resignations (which they characterize as constructive discharges).

Appellant Burgos was employed as a litigator in RTC's Dallas office. His troubles started, he alleges, when he notified his superiors of overbilling by outside counsel. In response, RTC management allegedly assigned him to undesirable cases, including some in which the RTC had already defaulted. Burgos claims that in one of these cases, *Crabb v. Federal Home Loan Mortgage Corp.*, his superiors continued to litigate despite a settlement, against the wishes of the client (another branch of the RTC) and in order to conceal their earlier default. Burgos urged his supervisors to abandon the litigation; when they did not heed him, he directed outside counsel to withdraw a pending motion. Burgos's superiors ordered him to rescind that instruction; when he refused, they countermanded it themselves. Burgos then filed an "Informative Motion" with the *Crabb* court, disclosing the role of his superi-

---

1. Appellants' briefs have not directed us to any evidence associating Taylor with any protest activity of hers, with or without Pederson, before the May 1992 "put-backs." In the summary judgment analysis we assume in her favor that such evidence exists.

ors in the decision to continue litigation, as well as his opposition to that decision.

The RTC notified Burgos that he would be fired for this insubordination; in fact it simply placed him on paid administrative leave. Eventually informed that he would be demoted two pay grades, he resigned on January 8, 1995. Like Taylor and Pederson, Burgos characterizes his resignation as a constructive discharge.

\* \* \*

As we have said, the district court dismissed the statutory claims of Pederson, Taylor and Burgos and granted the FDIC summary judgment on the constitutional ones. But there was another ex-employee, Dunn, who had joined the original claim. (A fifth plaintiff, the Government Accountability Project, was also a party to the district court litigation but has withdrawn from the action.) Although the district court dismissed the statutory claims of all plaintiffs, it initially withheld judgment on Dunn's constitutional claims. To avoid delay in their appeal, the three plaintiffs now before us filed a Motion to Direct Entry of Final Judgment without waiting for the disposition of Dunn's claims, arguing in the words of Rule 54(b) that there was "no just reason for delay." The court then issued an order, observing that grant of the plaintiffs' motion would be "just and proper," and ordering that the clerk "be directed" to enter final judgment dismissing their claims.

■■■ Rule 54(b) mediates between the sometimes antagonistic goals of avoiding piecemeal appeals and giving parties timely justice. See *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 8, 100 S.Ct. 1460, 1464–65, 64 L.Ed.2d 1 (1980). In a case involving multiple claims or parties, it allows the district court to "direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Federal

Rule of Civil Procedure 54(b). The district court functions as a "dispatcher," determining in its sound discretion when a claim should proceed on to appellate resolution, and when it should await its fellows.[2] *Curtiss-Wright*, 446 U.S at 8, 100 S.Ct. at 1464–65.

Here, the district court's order clearly gave the "express direction" that the rule requires, but did it make the necessary "express determination"? Given plaintiffs' invocation of Rule 54(b)'s "no just reason for delay" formula in their motion for entry of judgment under that rule, and the court's obvious embrace of their position, it is as clear as these things get that the court was convinced that the rule's criteria were satisfied. Our circuit has never decided precisely what a Rule 54(b) "express determination" requires. In *Kelly v. Lee's Old Fashioned Hamburgers, Inc.*, 908 F.2d 1218 (5th Cir. 1990), a deeply split Fifth Circuit considered the issue en banc, the majority finding it sufficient that the order and related parts of the record revealed an "unmistakable intent to enter a partial final judgment under Rule 54(b)." *Id.* at 1220. There was no need, said the majority, for the district judge to "mechanically recite the words 'no just reason for delay.'" *Id.* The majority, however, never really answered the dissenters' point that "express," the Rule's modifier of "determination," does not normally mean "implied." *Id.* at 1222; accord *Granack v. Continental Casualty Co.*, 977 F.2d 1143, 1144–45 (7th Cir. 1992).

Without some convincing answer to the Fifth Circuit dissenters' challenge, we do not know how our circuit could reject their analysis. Certainly no such answer emerged at oral argument. Were we to apply the dissenters' view, we would be compelled to dismiss the appeal. Here that would be clearly wasteful in the short run: the case would vanish from the docket of a panel that has invested much time on the merits. Our dis-

---

**2.** The district court may not, of course, use Rule 54(b) to certify a judgment that is not final by ordinary standards. See *Curtiss-Wright*, 446 U.S. at 7–8, 100 S.Ct. at 1464–65; *Tolson v. United States*, 732 F.2d 998, 999 (D.C.Cir.1984).

It is clear that the dismissals and summary judgments at issue here possess the requisite finality; they dispose of all the claims of the appellants here.

missal of this appeal, besides following the rules as understood by the Fifth Circuit dissenters, would have its pay-off in future cases, by inspiring closer district court focus on the criteria of Rule 54(b) and by removing ambiguities as to what they actually require.

■ In this case, happily, we need not bite this distasteful bullet. The government raised the Rule 54(b) issue in a motion for dismissal or summary affirmance before a motions panel of this court. The motion was denied, see March 31, 1997 Order, *Taylor v. FDIC* (No. 96–5267), and that decision is law of the case, preclusive for all matters decided expressly or by necessary implication. See *Crocker v. Piedmont Aviation,* 49 F.3d 735, 739 (D.C.Cir.1995). The panel's decision is binding, even though the adequacy of the determination is a jurisdictional prerequisite. See *LaShawn A. v. Barry,* 87 F.3d 1389, 1394 (D.C.Cir.1996) (en banc).

■ Law of the case, yes; law of the circuit, no. The order of the motions panel went unpublished and will bind no panel of this court in any other case. See D.C.Cir. Rule 28(c). Thus the issue that so divided the Fifth Circuit remains unresolved here. Cf. *U.S. General, Inc. v. City of Joliet,* 598 F.2d 1050, 1051 n. 1 (7th Cir.1979) ("Future Rule 54(b) certifications with similar deficiencies may not be expected to survive in this court.").

While on the subject of Rule 54(b), we note that some appellate courts not only demand that the "express determination" be literally express but also expect the district court to supply a statement of reasons. The lack of such a statement may leave the appellate court uncertain whether the district judge exercised its discretion soundly, or indeed whether it exercised its discretion at all. See, e.g., *United States v. Ettrick Wood Products, Inc.,* 916 F.2d 1211, 1218 (7th Cir. 1990); *Allis–Chalmers Corp. v. Philadelphia Electric Co.,* 521 F.2d 360, 364 (3d Cir.1975). Its presence aids both the circuit reviewer

and the district decisionmaker. See *Arlinghaus v. Ritenour,* 543 F.2d 461, 464 (2d Cir.1976). With a clear statement of reasons, "discretion carefully exercised is rarely upset." *Ettrick Wood,* 916 F.2d at 1218.

As law of the case removes the Rule 54(b) problem from our purview, we proceed to the merits.

\* \* \*

Pederson and Taylor were employed in the same office and allege largely the same pattern of disclosure and retaliation. We examine their claims as a unit, then those of Burgos.

■ The district court dismissed Pederson and Taylor's statutory claims under Rule 12(b)(6). We review this disposition de novo, *Alicke v. MCI Communications Corp.,* 111 F.3d 909, 912 (D.C.Cir.1997), and find that we cannot agree.

■ Dismissal under Rule 12(b)(6) is proper when, taking the material allegations of the complaint as admitted, *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969), and construing them in plaintiffs' favor, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), the court finds that the plaintiffs have failed to allege all the material elements of their cause of action. See, e.g., *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994).

Pederson and Taylor's statutory count claims that the RTC violated the RTC Whistleblower Act, 12 U.S.C. § 1441a(q), which prohibits discharge of or discrimination against employees because of their disclosure of information to the RTC, the Thrift Depositor Oversight Board, the Attorney General, or any appropriate Federal banking agency. But not all disclosures qualify for protection. The statute was amended effective December 17, 1993 to include disclosures of "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." The 1991 enactment, by contrast, protected only disclosures relating to "a possible violation of any law or regulation." Pub.L. No. 102–242,

§ 251, 105 Stat. 2236 (1991); 12 U.S.C. § 1831j.

■ The legal import of this is not that disclosures before the amendment are governed by the old statute and those after by the new. That would be akin to allowing discrimination against female employees if it were based on the fact that they had been women before the passage of Title VII. The relevant acts are the alleged retaliations. Those after the amendment are actionable if they came in response to disclosures (whenever made) in the broader class;[3] retaliation before the amendment is actionable only if the instigating disclosure revealed a possible violation of law or regulation.[4]

■ Thus, to state a claim for the purposes of Rule 12(b)(6), Pederson and Taylor must allege 1) a qualifying disclosure that 2) contributed to 3) retaliation, where what is required for a disclosure to qualify depends on the date of the alleged retaliation. This they achieve; ¶ 20 of their Complaint alleges that they "reported their concerns to the RTC Office of Inspector General regarding ... staffing decisions that potentially violated personnel laws and regulations." Paragraphs 29–42 (Pederson) and 47–52 (Taylor) allege retaliation, and ¶¶ 128–32 (Pederson) and 153–56 (Taylor) recapitulate and allege the causal links.

■ The FDIC argues that the allegations of ¶ 20 are in essence legal, not factual, and need not be accepted as true for the purposes of a Rule 12(b)(6) motion. The underlying notion is sound: Courts accept plaintiffs' allegations of fact, not their conclusions of law. See *Kowal*, 16 F.3d at 1276. If plaintiffs include the text of a disclosure in their pleadings, and then claim that it revealed a possible violation of law, we are not bound to accept that legal conclusion. If,

however, they merely allege that they "disclosed a possible violation of law," that is a statement of material fact that must be accepted as true for a Rule 12(b)(6) motion. We may not draw upon facts from outside the pleadings. See *Henthorn v. Dep't of the Navy*, 29 F.3d 682, 688 (D.C.Cir.1994). In consequence, a vague and conclusory complaint may survive a 12(b)(6) motion where more detail would disclose fatal weaknesses; defendants' remedy "is not to move [for] dismissal but to serve contention interrogatories ... or to proceed to summary judgment." *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 915 (7th Cir. 1985).

Here in fact the FDIC's motion to dismiss requested summary judgment in the alternative, and if summary judgment is the correct disposition, we may convert and affirm on those grounds. Cf. *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 157–58, 82 L.Ed. 224 (1937). Summary judgment is appropriate if the pleadings and record "show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We examine the facts in the record and reasonable inferences in the light most favorable to the nonmoving party, *Wardlaw v. Pickett*, 1 F.3d 1297, 1299 (D.C.Cir.1993), but do not accept bare conclusory allegations as fact. See *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir.1993). What this standard comes down to is that Pederson and Taylor must show, with respect to each essential issue on which they will bear the burden of proof at trial, either that the issue is conceded in their favor or that it turns on a genuinely disputed question of fact. See *Celotex Corp. v. Ca-*

---

3. The greater the interval between pre-December 17, 1993 disclosures and later adverse decisions, of course, the harder it will be for the plaintiff to show the causal link. But that is just a practical issue of proof.

4. Pederson and Taylor argue that the amendments should be given retroactive effect, so that pre-amendment retaliations (if there were any) for then-unprotected disclosures would become actionable when the disclosures became protect-

ed. This approach would "attach[] new legal consequences to events completed before [the amendments'] enactment," *Landgraf v. USI Film Products*, 511 U.S. 244, 270, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994). *Landgraf* says that statutes should not be read to produce such retroactivity in the absence of clear Congressional intent, see *id.*, which is completely absent here. See *Walleri v. Federal Home Loan Bank of Seattle*, 965 F.Supp. 1459, 1466 (D.Or.1997).

*trett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ From Pederson and Taylor's brief we learn that the personnel laws and regulations alleged to have been violated are 5 U.S.C. § 3502(a) and 5 CFR § 351.201. Appellants' Br. at 26. The former instructs the Office of Personnel Management to prescribe regulations for retention preferences in a reduction in force; the latter obliges agencies to follow 5 CFR Part 351 during a reduction in force. How the reorganization possibly violated these requirements is not apparent, especially given the FDIC's uncontroverted assertion that the reorganization did not constitute a reduction in force and hence was not governed by these sections.[5]

At oral argument, Pederson and Taylor's counsel explained that they did not respond to the FDIC's assertion because it was so ludicrous. Dignified silence is a dangerous tactic at best; here it proves fatal. Pederson and Taylor fail to offer any evidence that the cited laws even apply, much less were possibly violated. Their statement of genuine issues of material fact, filed pursuant to Local Rule 108(h), makes only the cryptic claim that the reorganization violated the law by failing to promote "the efficiency of the service," J.A. 294, a phrase that appears nowhere in 5 CFR Part 351. We conclude that there is no genuine issue of fact here: The memorandum to RTC management concerning the reorganization did not relate to any potential violation of law or regulation.

■ Pederson and Taylor had also asserted that the reorganization was undertaken to protect disloyal savings and loan fiduciaries; these assertions may well relate to possible violations of some law. They were made in the first instance, however, not to RTC superiors or the Attorney General but to GAO and the Senate Banking Committee,

J.A. 380, reaching any statutorily covered recipients only indirectly. Plaintiffs argue that it should make no difference. But the RTC Whistleblower Act affords its special protection (beyond that provided by the First Amendment) only for the act of "provid[ing] information to" designated entities. 12 U.S.C. § 1441a(q)(1). It seems reasonable that Congress would afford special protection for communications directed to the specified entities, all ones with a capacity to remedy wrongs brought to their attention, and would withhold the protection from communications that only drift into such hands by happenstance. Appellants' reading would completely thwart this channeling function.

Still, Pederson and Taylor's March 1992 memo arguably discloses gross mismanagement and hence might qualify under the amended statute. Thus, they would be protected, after December 17, 1993, from retaliation for that memo. Their problem is that they fail to identify such retaliation—or, indeed, any post–1993 retaliation at all. They focus primarily on their selection for the putback program and exile in the Special Projects Unit. The reassignment occurred May 11, 1992—too early to be proscribed retaliation given that the March 1992 memo was not protected at that time, and also, even if proscribed, too early to be actionable when this suit was filed in September 1994, given the two-year limitations period of the RTC Whistleblower Act.

■ Beyond this, Pederson points to a search of his computer and Taylor to an alleged "gag order" imposed in violation of her First Amendment rights in March 1994. Pederson's claim fails because the computer search took place, according to his affidavit, "[o]n or about March 12, 1993," J.A. 760, again too early to be proscribed, given that he had at that time made no disclosures protected by the pre-December 1993 law.[6]

---

5. 5 CFR § 351.201 limits its coverage to occasions on which an agency "releases a competing employee from his or her competitive level by furlough for more than 30 days, separation, demotion, or reassignment requiring displacement...." It is not at all clear that the reorganization entailed any releases from "competitive level," since FDIC employees on loan to the RTC

were by statute entitled to "be returned to a similar position." 12 U.S.C. § 1441a(q)(8)(B)(i).

6. Pederson attempts to make the computer incident do double duty, offering the search itself as an example of retaliation, and arguing also that his disclosure of the search was disclosure of a *Fourth Amendment violation* "directly to senior management." Appellants' Reply Br. at 13. Be-

Taylor's claim fails because the "gag order," attached to her affidavit, does little more than set out the principle "that attorneys do not discuss client matters with the media absent express client permission." J.A. 685. Although the memo clearly asserted the author's view that Taylor's "media contacts" violated the principle of client loyalty and confidentiality, and would justify at least a "formal reprimand," the author explicitly refrained even from that. To the limited extent that the memo goes beyond directing Taylor's attention to the policy, evidently of general application within the RTC and not unique to her, it does not qualify either as retaliation or discrimination, and is on its face no more than a response—perhaps a testy one—to Taylor's (unprotected) media communications, not to the March 1992 internal memo.

Both Pederson and Taylor suggest that their career advancement has been hindered "since May 1992 until the present." J.A. 336–37, 758–59. Ascertaining the relevant dates for their various allegations is not easy, but we can find only a few incidents occurring after December 17, 1993. None of the actual failures to promote fell after that date. Pederson applied for various section chief positions, all before the fall of 1993, J.A. 758–59, and Taylor, so far as her affidavit reveals, applied for nothing after August 1993. J.A. 679–82.

 Two allegations do stretch across the December 1993 threshold. First is the repeated failure to designate either Pederson or Taylor the acting section chief when their superiors temporarily left the office. J.A. 337, 759. To make out a prima facie case of retaliation under the RTC Whistleblower Act, a plaintiff must show that a protected disclosure was a contributing factor in the adverse action complained of. See 12 U.S.C. § 1441a(q)(5) (prescribing use of 5 U.S.C. § 1221's burden of proof system); 5 U.S.C. § 1221(e)(1). This does not absolve the plaintiff of the need to offer evidence that would amount at least to a prima facie showing of discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

Pederson and Taylor have both failed to cross that modest threshold. *McDonnell Douglas* requires the plaintiff to show (among other items) that he "applied and was qualified" for the vacancy, as well as that the employer, though rejecting plaintiff, continued to seek applicants of plaintiff's qualifications. *Id.* Pederson and Taylor offer no such evidence with respect to the acting section chief position.

Equally damaging for Pederson and Taylor, we do not believe that temporary designation as acting section chief is one of the "terms, conditions, or privileges of employment" compassed by the Act. 12 U.S.C. § 1441a(q)(1). The phrase "terms, conditions, or privileges of employment" is identical to the language of Title VII, 42 U.S.C. § 2000e–2(a). Courts applying Title VII have consistently focused on "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating ... [and not] interlocutory or mediate decisions having no immediate effect upon employment conditions...." *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981) (en banc); accord *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995). This circuit has never decided the issue. See *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1555 (D.C.Cir.1997) (noting issue without deciding). But see

cause this disclosure may have taken place as early as March 12, 1993, it pre-dates the amendments and would, if qualifying for Whistleblower Act protection, extend Pederson's protection back to that date. We assume that the search did qualify as a possible illegality. Nothing in Pederson's affidavits, however, supports the claim that he disclosed it to senior management, or to any listed entity. There is evidence that Pederson discussed the matter with Barbara Shangraw, who herself had ordered the search, but the conversation was at her request for the purpose of driving home to Pederson the policy against using corporate facilities for personal purposes. J.A. 1218, 1444. We assume arguendo that a disclosure of an illegality to the perpetrator herself could in some instances qualify (as where the whistleblower tells a covered person of an illegality that, unbeknownst to the whistleblower, had been ordered by the covered person). But we do not think that protesting about the legality of a search to a superior who ordered it, in the context of a meeting called by the superior to discuss its fruits, can fairly be characterized as a disclosure—except of the employee's view of the event.

*Hayes v. Shalala*, 902 F.Supp. 259, 266–67 (D.D.C.1995) (rejecting *Page*).

We need not decide that precise issue either; what defeats these claims (besides want of a prima facie case) is not that the denials complained of were mediate but that they were minor. The federal courts cannot be wheeled into action for every workplace slight, even one that was possibly based on protected conduct. Cf. *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir.1987) (finding no adverse action where employer required employee to sign form acknowledging circumstances of transfer and failed properly to document sick leave).

Pederson's allegation that he was refused permission to attend an internal RTC course on alternative dispute resolution, J.A. 1771–72, the second qualifying claim, also fails for want of a prima facie case. Assuming that exclusion from this one seminar amounted to such a denial of training opportunities as to represent an adverse action, see *Page*, 645 F.2d at 233, Pederson has failed to show how his treatment differed from that of similarly-situated employees.

Finally, both Taylor and Pederson allege a continuing—indeed, "unrelenting"—pattern of retaliation extending up until their resignations. In part this fails for lack of specificity, but the more serious flaw is that the specific elements of the litany—isolation, misdirected mail, poor telephone service, unsuitable work—simply constitute the consequences of the initial reassignment. Even if that reassignment was retaliatory, it was not wrongful, since at that point Pederson and Taylor had made no disclosures qualifying them for RTC Whistleblower Act protection; and even if it were wrongful, any resulting claim would have been time-barred at the point when Pederson and Taylor filed suit. Absent some evidence that officials aggravated conditions in appellants' occupational Siberia, the new statute could not render the continuing consequences of an innocent action wrongful—unless the amendment affirmatively called for remediation of the past innocent act. In any case, an untimely suit "cannot be revived by pointing to effects within the limitations period of unlawful acts

that occurred earlier." *Dasgupta v. University of Wisconsin Board of Regents*, 121 F.3d 1138, 1140 (7th Cir.1997); see *Palmer v. Barry*, 894 F.2d 449, 453 (D.C.Cir.1990). Just as the failure of appellants' superiors to relieve them from life in Special Projects, though occurring within the limitations period, cannot revive their claim or toll the statute of limitations, neither can that inaction constitute post-December 17, 1993 retaliation.

Nor does the concept of "continuing violation" assist Pederson and Taylor in showing that the continuation of their grim working conditions amounted to a post–1993 retaliation. For statute of limitations purposes, a continuing violation is "one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period," *Dasgupta*, 121 F.3d at 1139, typically because it is only its cumulative impact (as in the case of a hostile work environment) that reveals its illegality, *id.* But the banishment of Pederson and Taylor to Special Projects, as they allege it, amply manifested itself as a possible retaliation from the start. Just as the continuing low pay entailed by a demotion cannot toll the statute of limitations covering the demotion, so continuing hardship in Special Projects cannot qualify as a post–1993 retaliation.

One final issue remains. The district court denied plaintiffs' motion for a continuance to take discovery, a decision that they assign as error and that we have no difficulty in affirming under the abuse of discretion standard appropriate to Rule 56(f). That takes care of discovery with respect to the grants of summary judgment by the district court, but what of a converted 12(b)(6) dismissal? When a district court converts a Rule 12(b)(6) motion to one for summary judgment, it must allow all parties both a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56" and a chance "to pursue reasonable discovery." *First Chicago Int'l v. United Exchange Co., Ltd.*, 836 F.2d 1375, 1380 (D.C.Cir.1988) (quoting Federal Rule of Civil

Procedure 12(b)). The district court allowed the former, in the form of affidavits. As to discovery, since we are converting the 12(b)(6) motion on appellate review, we do not have the benefit of the district court's determination of the necessity of discovery before summary judgment on the statutory count. It is possible that the district court, in denying the continuance, implicitly found no need for discovery before summary judgment on this count, but it is equally possible that it had already flagged the count as failing to state a claim, in which case the question of discovery would not arise.

■ We believe the soundest course, in this case, is to decide the discovery question de novo. Pederson and Taylor, in their motion for a continuance, make much of the fact that retaliatory animus may be proved by circumstantial evidence. J.A. 137. Discovery, they claim, is necessary to allow them to ferret out such proof. But the weakness of Pederson and Taylor's case is not that it lacks evidence of animus—though it does— but that it lacks a showing of unlawful retaliation. Discovery will not help on this front, and Pederson and Taylor do not suggest that it will. There is no genuine issue of fact as to the existence of proscribed retaliation. Accordingly, we would rule as did the district court on discovery, and, having converted the 12(b)(6) motion to a motion for summary judgment, affirm the district court's dismissal of Pederson and Taylor's statutory claim because a grant of summary judgment would have been correct.

\* \* \*

The district court granted summary judgment for the FDIC on the First Amendment claims of Pederson and Taylor, reasoning that the voluntary nature of their departure precluded the equitable relief sought. Reviewing this determination de novo, we find that voluntary resignation bars not merely relief but also federal jurisdiction.

■ To be sure, Pederson and Taylor term their resignations "constructive dis-

charges." We rejected that characterization in our denial of a preliminary injunction, see *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1505 (D.C.Cir.1995) ("*Taylor I*"), and although that decision lacks authoritative weight for this appeal, see *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981), reconsideration has not changed our opinion. "[A] constructive discharge occurs where the employer creates or tolerates discriminatory working conditions that would drive a reasonable person to resign." *Katradis v. Dav-El of Wash.*, 846 F.2d 1482, 1485 (D.C.Cir. 1988) (internal quotation marks omitted). It does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive, even if the employer's misbehavior creates the unpleasantness or, as we observed in the earlier appeal, its largesse affirmatively increases the appeal of the employee's alternatives. The standard may vary with the character of the job for which the employee was hired and thus, indirectly, with the employee's skills; conditions that are conventional for a stevedore may be intolerable for a lawyer, and perhaps vice versa. But the standard cannot ebb and flow with the tide of a particular employee's specific job alternatives. Here, Pederson and Taylor endured whatever the RTC inflicted until May 1995, when they took advantage of the severance package offered by the Voluntary Separation Incentive Program. They do not suggest that any simultaneous increase in the wattage of harassment drove them out. Thus no triable issue of fact exists on the question of constructive discharge.[7]

■ A finding that no constructive discharge occurred will have different consequences according to the type of relief requested. Pederson and Taylor seek reassignment to their 1991 positions, injunctive relief against future harassment, and damages. We examine each in turn. The request for reassignment appears in

---

7. Pederson and Taylor sought leave to amend their complaint in order to offer new evidence bearing on constructive discharge. The district court denied their motion, and we uphold that decision under the abuse of discretion standard, given both the lateness of the filing of the proposed amended complaint and its failure, together with the additional affidavits (included in the Joint Appendix) to firmly close the gaps in their case.

the original complaint, J.A. 125, and was made when Pederson and Taylor were still employed by the RTC. They left the RTC during the pendency of this litigation, and what used to be reassignment now accordingly would require reinstatement. Since the original complaint simply asks for "an order restoring" them to their 1991 positions, we could read it as in fact requesting reinstatement. This would be consistent with the desires expressed in a proposed amended complaint rejected by the district court. To save this element of the First Amendment count, however, would require more than turning reassignment into reinstatement to account for the changed circumstances. The plaintiffs' voluntary departure creates a large hole in their cause of action: In requesting reinstatement, they seek a remedy for injury that is in large part self-inflicted. This is true whether we treat the defect as a matter of standing or the merits.

Article III standing requires the plaintiff to show causation—that his injury is "fairly traceable to the defendant's allegedly unlawful conduct." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Our rejection of Pederson and Taylor's claim of constructive discharge is concomitantly a decision that their voluntary acts are sufficient independent causes of their separation from the RTC.

This is quite consistent with their (theoretically) having a claim against the RTC for its earlier mistreatment. Suppose an employer wrongly denied an employee $25 in wages, upon which the employee left in a huff. Plainly he would have no claim to reinstatement, however valid his demand for $25 damages. Had Pederson and Taylor remained, they might have been entitled to some sort of restoration to their earlier status; having left under circumstances for which the RTC is not legally culpable, however, they cannot claim that the RTC has deprived them of their jobs, even if its prior treatment of them, though falling short of constructive discharge, was actionable. Failing to show causation, they lack standing.

■ Similarly, wrongful discharge (either actual or constructive) is a necessary element of a claim for reinstatement—discrimination and voluntary resignation are not enough. See, e.g., *Maney v. Brinkley Mun. Waterworks & Sewer Dep't*, 802 F.2d 1073, 1075–76 (8th Cir.1986); *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342–43 (10th Cir.1986). Our rejection of the allegation of constructive discharge thus would also serve to resolve this claim against plaintiffs on the merits.

■ The appropriate treatment of cases in which the standing inquiry overlaps with the merits so precisely is not entirely clear. We have disposed of cases on standing grounds after the merits-laden determination that a plaintiff's claim "ha[d] no foundation in law," *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C.Cir.1997)—something we think could fairly be said of a reinstatement claim made in the face of voluntary resignation. See also *Arjay Assocs. v. Bush*, 891 F.2d 894, 898 (Fed.Cir.1989) (affirming dismissal for lack of standing after concluding plaintiff lacked enforceable right). But cf. *Lewis v. Knutson*, 699 F.2d 230, 237 (5th Cir.1983) (suggesting that element essential to both standing and merits should be reviewed only for facial sufficiency of pleadings in standing analysis); *ACLU v. FCC*, 523 F.2d 1344, 1348 (9th Cir.1975) (disposing of case on merits after determining that standing and merits inquiries overlapped). In this case, the consequences of a disposition based on lack of standing do not differ greatly from those of one on the merits. On either approach, plaintiffs' request for reinstatement fails as a result of their voluntary resignation. The chief distinction is that after finding no standing, we may not affirm the district court's grant of summary judgment but must vacate and remand with instructions to dismiss. See *Ramallo v. Reno*, 114 F.3d 1210, 1213–14 (D.C.Cir.1997) (vacatur and remand with instructions to dismiss is appropriate disposition when appellate court loses jurisdiction). This disposition is employed regardless of whether the missing element of standing is required for the substantive cause of action. See *Clajon Production Corp. v. Petera*, 70 F.3d 1566, 1573 (10th Cir.1995) (dismissing for lack of jurisdiction despite identity of issues). Consequently, we

will dispose of the reinstatement claim on standing grounds.

■■■■ The original complaint also sought a permanent injunction against future retaliation. As we held before, Pederson and Taylor's resignation moots this request by eliminating the possibility of future harm and the utility of the injunction. *Taylor I*, 56 F.3d at 1502–05. We have no jurisdiction over a moot claim. Finally, they ask for compensatory damages, a demand clearly not mooted by termination of employment. See *Bois v. Marsh*, 801 F.2d 462, 468–71 (D.C.Cir.1986). To the extent that this request rests on the RTC Whistleblower Act, which explicitly offers a damages remedy as well as reinstatement, 12 U.S.C. § 1441a(q)(3), it falls with their statutory claim, as discussed above.

■■■■ Pederson and Taylor could also conceivably be seeking damages under the First Amendment. The defendant in this suit, however, is the FDIC, and no cause of action for damages for constitutional violations—whether called a *Bivens* action or not—is to be implied against government agencies. *FDIC v. Meyer*, 510 U.S. 471, 484–86, 114 S.Ct. 996, 1004–06, 127 L.Ed.2d 308 (1994). Pederson and Taylor also name the RTC CEO (succeeded by the Chairman of the FDIC) as a defendant, but they name him in his official capacity and allege no unlawful acts on his part.[8]

As we have no jurisdiction over Pederson and Taylor's constitutional claims to equitable relief, we vacate the district court's grant of summary judgment and remand with instructions to dismiss.

\*　　\*　　\*

The third appellant is Burgos, who also brings statutory and constitutional claims. We find his statutory complaint facially inadequate and affirm the district court's dismiss-

al; we also affirm the grant of summary judgment on his constitutional claim.

The retaliation that Burgos points to is, primarily, the demotion that led to his resignation. Although the complaint may be read to suggest that his assignment to "problem cases" also constituted retaliation for disclosures about overbilling by outside law firms, counsel appeared to abandon this aspect at oral argument, describing it as merely stage-setting; nor does Burgos mention it in his briefs. Appellants' Br. at 27, 32–34; Appellants' Reply Br. at 17–20.

■■■ The demotion came in response to Burgos's filing his "Informative Motion" with the district court in the *Crabb* litigation. As far as the RTC Whistleblower Act is concerned, Burgos encounters the immediate difficulty that the Act protects disclosures only to the entities specified: the RTC, the Thrift Depositor Protection Oversight Board, the Attorney General, or an appropriate banking agency. 12 U.S.C. 1441a(q). It does not protect communications to courts. Although the "Informative Motion" states that a copy is being sent to the RTC Inspector General, Burgos himself does not claim that that copy played any role in his demotion; his superiors were amply infuriated by his filing in court.

\*　　\*　　\*

Burgos argues also that his demotion violated his First Amendment rights, invoking the principle giving government employees some protection from discipline for their speech. See *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Nothing in this doctrine automatically withholds protection for disclosures to courts. Nonetheless, the district court granted summary judgment to the defendant, and we affirm.

---

8. Even supposing that appellants intended to proceed against the CEO individually, a suit for damages under the First Amendment would not get off the ground. We will not infer a *Bivens* remedy where Congress has created "comprehensive procedural and substantive provisions giving meaningful remedies against the United States...." *Bush v. Lucas*, 462 U.S. 367, 368, 103 S.Ct. 2404, 2406; 76 L.Ed.2d 648 (1983).

Here Congress's enactment of the RTC Whistleblower Act precludes a *Bivens* action under the First Amendment. See *Bush*, 462 U.S. at 367–90, 103 S.Ct. at 2405–17 (refusing to imply *Bivens* remedy under the First Amendment given Civil Service Reform Act); *Walleri v. Federal Home Loan Bank of Seattle*, 83 F.3d 1575, 1583–84 (9th Cir.1996) (same with respect to FDIC Whistleblower Act).

*Pickering* directs courts to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734–35. *Connick* makes clear that the doctrine covers only speech on a matter of public concern, i.e., of "political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690; see *F.D.R. Fox v. District of Columbia,* 83 F.3d 1491, 1493 (D.C.Cir. 1996).

The public concern inquiry is one of law, *Connick,* 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10; *Fox,* 83 F.3d at 1493, to be determined by looking at "the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690. The district court concluded that Burgos's "Informative Motion" did not involve a matter of public concern. Reviewing de novo, we agree.

Burgos in his briefs claims that he disclosed to the court that his supervisors were continuing to litigate a moot case, Appellants' Br. at 34, in order to cover up their earlier default, Appellants' Br. at 19–20. This sort of governmental misbehavior certainly sounds like an object of public concern, although as a preliminary matter, it is not altogether clear how the alleged cover-up was supposed to function. Litigating a settled case does not seem an effective strategy for concealing a default; presumably, the shirkers would want to slink away from court, not call attention to their neglect by bringing motions to vacate. But we need not try to unravel this tangle, for a glance at the actual "Informative Motion" cuts clean through.

What that motion discloses is the following: The opposing party had asked for sanctions against Burgos. He recommended to his superiors that litigation be discontinued and unilaterally instructed outside counsel to withdraw the pending motion to vacate the judgment. He refused an order to change his instructions to the outside counsel, calling it "unethical," and his superiors overrode his wishes. J.A. 1080–83. There is no mention of mootness, and none of an attempt to camouflage default, but prominent reference to the fact that sanctions were being sought.

The content, form, and context of the motion lead to the conclusion that, as Burgos's First Affidavit admits, it was intended to "identify[ ] who was responsible for the direction of this litigation and that [Burgos] had ordered the Motion to Vacate to be withdrawn." J.A. 997. Neither of these elements, without more, is a matter of public concern; released to the public, this motion would reveal no more than "the fact that a single employee is upset with the status quo." *Connick,* 461 U.S. at 148, 103 S.Ct. at 1691. The purpose of the communication was to avoid personal sanctions, not to expose wrongdoing. Whatever the outcome with respect to the former (Burgos does not tell us), there was no real gesture towards the latter, and the incidental and unexplained reference to "unethical conduct" does not change this fact. Of course a speaker might combine an effort to deflect blame with a *Connick*-qualifying revelation of government dereliction. But to say, "He did it," or "He made me do it," where "it" is already established, is just garden-variety finger-pointing. And rhetorical embellishments marginally increasing the associated obloquy do not elevate it to a matter of public concern. Accordingly, disciplinary actions taken in response to Burgos's affidavit could not offend the First Amendment.

\* \* \*

With respect to Pederson and Taylor, we convert the government's 12(b)(6) motion on the statutory counts to a motion for summary judgment and affirm. On the constitutional count, finding no jurisdiction over the equitable claims we vacate the grant of summary judgment and remand with instructions to dismiss. We find no constitutional cause of action for damages, and affirm the grant of summary judgment. With respect to Burgos, we affirm both the dismissal of the statutory count and the grant of summary judgment on the constitutional count.

*So ordered.*

## 770

ROGERS, Circuit Judge, concurring:

I join the opinion of the court save for its treatment of appellants' request for equitable relief as a matter of constitutional standing. See opinion at [766]. Rather, because there was insufficient evidence to show that appellants were constructively discharged, given their voluntary departures, see opinion at 16–17, their request for equitable relief fails for lack of an evidentiary foundation. This finding seems to me to be the fundamental one. On their pleadings, appellants' injury is traceable to appellees' actions; that the court cannot credit the pleadings is not a standing analysis, but a determination of evidentiary sufficiency. *See Claybrook v. Slater*, 111 F.3d 904, 907 (D.C.Cir.1997); *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 n. 1 (D.C.Cir.1996) (en banc) (citing *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968)).