United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 14, 1998 Decided November 13, 1998 

 No. 98-7020

 Paul Talcott Currier, 

 Appellant

 v.

 Radio Free Europe/Radio Liberty, Inc., 

 Appellee

 Appeal from the United States District Court 

 for the District of Columbia 

 (97cv01619)

---------

 Peter C. Cohen argued the cause and filed the briefs for 
appellant.

 Gil A. Abramson argued the cause for appellee. With him 
on the brief were David G. Leitch and Catherine E. Stetson.

 Before: Silberman, Rogers, and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Silberman.

 Silberman, Circuit Judge: Appellant brought a Title VII 
suit against his employer. The employer moved for summary 

judgment, asserting that appellant's suit was barred because 
he had not timely exhausted his administrative remedy with 
the EEOC. Rejecting appellant's contention that he had filed 
his EEOC complaint on time and his alternative argument 
that equitable principles should operate to toll the filing 
requirement, the district court granted summary judgment in 
favor of the employer. We reverse in part and affirm in part.

 I.

 Appellant Paul Currier was hired as an independent con-
tractor by appellee Radio Free Europe/Radio Liberty, Inc., a 
non-profit Delaware corporation with primary operations in 
Prague, the Czech Republic. Appellant was to serve as a 
computer network engineer and systems analyst at the 
Prague location, and entered into a six-month contract with 
appellee to begin December 31, 1995 and to expire on June 
30, 1996.1

 In February or March 1996, Currier went to a restaurant 
in Prague after work. Candace O'Brien, appellee's Director 
of Human Resources, was seated at a table with other co-
workers. O'Brien, apparently inebriated, made disparaging 
comments regarding appellant's sexual prowess. She then 
unbuttoned his pants, squeezed his penis, and exposed his 
testicles. The following day, O'Brien--a supervisory official 
who had authority to fire appellant--instructed him that "he 
had better get in line [with her version of what happened] or 

__________
 1 Of course we take the facts and all reasonable inferences 
therefrom in the light most favorable to appellant, the nonmoving 
party. See, e.g., Taylor v. FDIC, 132 F.3d 753, 762 (D.C. Cir. 1997). 
We note that appellant, then acting pro se, alleged neither his 
finality nor his equitable estoppel argument in his complaint, but 
only in his opposition papers to appellee's motion for summary 
judgment. Although appellee raises the issue of whether appellant 
should be entitled to amend his complaint in the absence of a formal 
request under Fed. R. Civ. P. 15, we assume without deciding that 
appellant would be entitled to amend his complaint. We think this 
course proper given the district court's disposition of the summary 
judgment motion in light of all of appellant's allegations, see Civ. 
No. 97-1619, Mem. Op. at 11 n.3 (D.D.C. Jan. 14, 1998).

he would have a problem with her." (O'Brien's "official 
version" maintained that appellant had voluntarily exposed 
himself at the table.) O'Brien further threatened that if 
appellant discussed the actual incident, his employment con-
tract would not be renewed and he would have problems 
during the remainder of his existing contract. Appellant took 
O'Brien's threats seriously, and refrained from mentioning 
the incident. But O'Brien often recounted the "official ver-
sion," and when appellant was asked for his account by a co-
worker in O'Brien's presence, he disputed the "official ver-
sion." O'Brien warned appellant not to make such a mistake 
again.

 Soon thereafter, Currier encountered one of the "problems" 
that O'Brien had promised. At a workplace social event, 
appellant had a heated discussion with a female co-worker 
about the definition of sexual harassment. The following day, 
he learned that O'Brien was investigating the incident and 
that he was suspected of sexual harassment against the 
female co-worker. Although the investigation was without 
basis in fact, he received a termination letter from O'Brien on 
May 14, 1996. He viewed this accusation as a pretext for 
retaliating against him because of his earlier opposition to 
O'Brien's sexual harassment of him.

 Less than a week after receiving O'Brien's termination 
letter, Currier met with Robert Gillette, appellee's Director of 
Broadcasting and a higher ranking management official than 
O'Brien. Appellant told Gillette that his previous encounters 
with O'Brien made it impossible for O'Brien to conduct a 
neutral investigation of appellant's asserted sexual harass-
ment of the female co-worker. Gillette promised to conduct a 
second investigation that would be fair and impartial, and 
assured Currier that there would be "no final determination" 
regarding his employment status until that second investiga-
tion was concluded.

 Appellant stopped coming to work after receiving his termi-
nation letter, and his contract expired by its terms on June 
30, 1996. But he did not give up his efforts to return to 
appellee's employ. Rather, he inquired several times about 
the status of Gillette's investigation. Shortly before Thanks-

giving 1996, he met with his former supervisor, Tom Morgan, 
and Gillette. Appellant was told that the investigation was 
still continuing and had not yet been concluded. Gillette 
referred to Morgan as appellant's present "boss" and said 
that Morgan "will always be your boss."

 Appellant filed an administrative complaint with the San 
Francisco office of the EEOC on March 28, 1997. The EEOC 
issued a notice of right to sue, and appellant brought suit 
against appellee in the district court under Title VII, contend-
ing, first, that O'Brien had sexually harassed him, and second, 
that she had retaliated against him for opposing her advances 
by terminating his employment. Appellee moved to dismiss 
the complaint, or in the alternative for summary judgment, on 
the ground that appellant had not filed his EEOC complaint 
in the time required by 42 U.S.C. s 2000e-5(e)(1) (1994). 
Appellant argued in opposition that it was improper to start 
the clock when he received the termination letter because 
that termination decision was not a final decision. Alterna-
tively, he argued that one of appellee's officials had misled 
him into believing that he would be rehired, and therefore 
that appellee should be equitably estopped from asserting the 
statutory deadline. The district court disagreed and granted 
summary judgment in favor of appellee.

 II.

 42 U.S.C. s 2000e-5(e)(1) requires that "[a] charge ... 
shall be filed [with the EEOC] within one hundred and eighty 
days after the alleged unlawful unemployment practice oc-
curred."2 Only after exhausting this administrative remedy 
can an aggrieved person bring suit in district court. Jarrell 
v. United States Postal Serv., 753 F.2d 1088, 1091 (D.C. Cir. 

__________
 2 A three-hundred-day time limit applies when the aggrieved 
person has initially instituted proceedings with a state or local 
agency with authority to grant or seek relief from the unlawful 
practice. See 42 U.S.C. s 2000e-5(e)(1). The district court con-
cluded that this longer time limit did not apply to appellant, because 
appellant never instituted proceedings with the District of Columbia 
Office of Human Rights and because that office would not have had 

1985) (citing Brown v. General Servs. Admin., 425 U.S. 820, 
832-33 (1976)). Here, the parties agree that appellant filed 
his EEOC complaint on March 28, 1997. For appellant's 
EEOC complaint to have been timely, the precise " 'unlawful 
employment practice' of which he complains," Delaware State 
College v. Ricks, 449 U.S. 250, 257 (1980), must have occurred 
within 180 days of his EEOC filing, i.e., on or after Septem-
ber 29, 1996.

 The parties disagree on when the unlawful employment 
practice occurred, and thus on when the statutory clock 
started ticking. Appellee argues that we should count from 
the date appellant received his termination letter, May 14, 
1996; thus measured, appellant did not file his EEOC com-
plaint for 328 days, which is too late. Appellant, while not 
offering a specific starting date, contends that the clock did 
not start ticking until long after May 14, 1996, because the 
May 14 termination decision was not yet a final decision. 
Alternatively, he argues that appellee's manager's misleading 
assurances of reinstatement should equitably estop appellee 
from asserting the statutory filing deadline.3 Under either of 
appellant's approaches, of course, he would not be deemed to 
have failed to exhaust his administrative remedy.4

__________
subject matter jurisdiction over his charge in any event. Appellant 
does not challenge these conclusions on appeal.

 3 Appellant argues in his reply brief that appellee waived its right 
to assert the statute of limitations by raising that defense in its pre-
answer motion rather than in its answer--which has yet to be filed. 
This argument could not prevail because appellant asserted it for 
the first time on appeal. See Singleton v. Wulff, 428 U.S. 106, 119 
(1976). In any event, it is without merit given our recent decision 
in Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. 
Cir. 1998), where we held that "an affirmative defense may be 
raised by pre-answer motion under Rule 12(b) when the facts that 
give rise to the defense are clear from the face of the complaint."

 4 Appellant focuses on the equitable estoppel argument in his 
brief and does not clearly articulate the finality argument as a 
separate issue. For ease of analysis, we treat the issues separately.


 A.

 We begin with the question of when (if ever) appellant had 
notice that the termination decision was final so as to start 
the clock on the EEOC filing deadline. See Ricks, 449 U.S. 
at 261 (holding that the starting point for the deadline occurs 
when plaintiff has notice of an official, i.e., not "tentative," 
decision). The parties agree that appellant received the 
termination letter from O'Brien on May 14, 1996,5 and that 
O'Brien had the authority to fire him.

 But were the circumstances such that O'Brien's decision 
was not actually final? Appellant claims that Gillette, a 
manager directly superior to O'Brien in appellee's organiza-
tional hierarchy, assured him less than a week after May 14 
that O'Brien's decision was not a "final determination." Gil-
lette is claimed to have again told Currier around Thanksgiv-
ing that the investigation was still ongoing; Currier was not 
told that Gillette's investigation had concluded by the time he 
filed his charges with the EEOC's San Francisco office the 
following March. Appellee reminds us that in Ricks, the 
Supreme Court was careful to point out that an employer that 
expresses an "official position" and simultaneously "indi-
cate[s] a willingness to change its [official position]" based on 
the outcome of a pending grievance proceeding does not 
thereby render that "official position" a "tentative" decision. 
Ricks, 449 U.S. at 261. And appellee refers us to our recent 
warning that "a plaintiff [may not] avoid the holding in Ricks 
simply by labeling the final decision 'preliminary' and proce-
dures to review that decision an 'integral part' of the decision 
process rather than collateral review of the final decision." 
Harris v. Ladner, 127 F.3d 1121, 1125 (D.C. Cir. 1997).

__________
 5 That appellant's six-month contract expired by its own terms on 
June 30, 1996 does not have any relevance for the start date 
because appellant does not allege any continuing violation between 
May 14, 1996 and June 30, 1996. See Ricks, 449 U.S. at 257 ("Mere 
continuity of employment, without more, is insufficient to prolong 
the life of a cause of action for employment discrimination.").


 It is true that the reconsideration of Currier's termination 
would not alone render the initial decision "preliminary" 
rather than "final." But we think appellant points to more 
than mere reconsideration in his effort to identify a later 
starting date for the statutory clock. He claims that a 
supervisor of the initial decision-maker informed him shortly 
after that initial decision that "there would be no final 
determination ... until the conclusion of his investigation." 
In other words, an authoritative voice (Gillette) expressly 
disavowed the finality of the initial determination,6 which 
implies a later starting date--though it remains unclear ex-
actly when the decision became final--that could bring appel-
lant's EEOC complaint within the statutory time limit. 
Whether Gillette did indeed make such an assurance and 
whether, if he did, it was true, may well be contested.7 At 
this juncture, however, appellant has created a genuine issue 
on this material fact. See Fed. R. Civ. P. 56(c); Anderson v. 
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

__________
 6 We note that to our knowledge appellee did not have in place a 
formal direct or collateral review procedure for personnel decisions. 
Cf. Harris, 127 F.3d at 1125 (distinguishing Ricks on the ground 
that the formal reconsideration process in Ricks resembled collater-
al review rather than direct review). In such a situation, it seems 
appropriate to put stock in a manager's characterization of the 
decisionmaking process.

 7 If Gillette's description of O'Brien's decision as non-final were a 
falsehood, appellee might be equitably estopped, see Part II.B infra, 
from asserting Title VII's EEOC filing deadline as an affirmative 
defense. Cf. Ricks, 449 U.S. at 261 (holding that an employer's 
offer to reconsider a final decision does not toll the limitations 
period as a matter of equity, but making no mention of the 
possibility that a false offer could equitably estop the employer). If 
appellant fails on remand to prove the facts underlying his finality 
argument, he still may attempt to prove the facts underlying his 
equitable estoppel argument under our alternative holding in Part 
II.B infra.


 B.

 Even if we viewed the May 14, 1996 letter as a final 
decision that started the statutory clock, we would still con-
clude that the district court improperly granted summary 
judgment in favor of appellee because appellant has pointed 
to sufficient facts in his affidavit to create a genuine issue as 
to whether equitable principles should toll the EEOC filing 
deadline.

 Title VII's time limit on filing a complaint with the EEOC 
is not jurisdictional and is subject to "estoppel[ ] and equita-
ble tolling." Zipes v. Trans World Airlines, Inc., 455 U.S. 
385, 393 (1982). Both equitable estoppel and equitable tolling 
operate, in a practical sense, to toll a limitations period. 
Although the Supreme Court and our court have occasionally 
conflated the two doctrines, see, e.g., Irwin v. Department of 
Veterans Affairs, 498 U.S. 89, 96 (1990); Bowden v. United 
States, 106 F.3d 433, 438 (D.C. Cir. 1997), they have distinct 
criteria. Whereas equitable tolling allows a plaintiff to avoid 
the bar of the limitations period if despite all due diligence he 
is unable to obtain vital information bearing on the existence 
of his claim, Smith-Haynie v. District of Columbia, 155 F.3d 
575, 579 (D.C. Cir. 1998), equitable estoppel in the statute of 
limitations context prevents a defendant from asserting un-
timeliness where the defendant has taken active steps to 
prevent the plaintiff from litigating in time, id. at 580; see 
also Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450-52 
(7th Cir. 1990). Here, we treat appellant as asserting the 
latter.

 Again we begin with Ricks. There the Supreme Court 
reaffirmed that "the pendency of a grievance, or some other 
method of collateral review of an employment decision, does 
not toll the running of the limitations periods." Ricks, 449 
U.S. at 261 (citing International Union of Elec., Radio, and 
Mach. Workers v. Robbins & Myers, Inc., 429 U.S. 229, 236-
40 (1976)). Appellee contends that because appellant's equi-
table estoppel argument rests only on an allegation that the 
termination decision was being reconsidered, it is foreclosed 
by Ricks. If that were all Currier alleges, we would agree. 

In that regard, Gillette's statement promising appellant a 
"fair and impartial investigation," standing alone, provides 
inadequate support for appellant's equitable estoppel theory. 
Similarly insufficient, by themselves, are Morgan's instruction 
to "hang tight" and his assurance that "it's not over yet."

 We think, however, that an employer's affirmatively mis-
leading statements that a grievance will be resolved in the 
employee's favor can establish an equitable estoppel. See 
Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 
1532 (11th Cir. 1992) (sex discrimination plaintiff was given 
"repeated assurances" that her salary would be raised to the 
level that other workers were receiving); Coke v. General 
Adjustment Bureau, 640 F.2d 584, 595 (5th Cir. 1981) (em-
ployer misrepresented to employee that it would reinstate 
him). Under those circumstances, an employee understand-
ably would be reluctant to file a complaint with the EEOC for 
fear he would jeopardize his chances to gain relief voluntarily.

 Appellant has identified statements made by one of his 
supervisors from which he concluded not only that he was 
being reconsidered, but that he would be reinstated. Specifi-
cally, he asserted the following in his affidavit, describing a 
meeting shortly before Thanksgiving 1996, "Mr. Gillette re-
ferred to Mr. Morgan as 'my boss.' Mr. Gillette said that Mr. 
Morgan was my boss and would always be my boss," which, 
in context, could be understood to mean that Currier would 
be triumphant. To be sure, it is a bit of a stretch for 
appellant to have inferred from these statements that appel-
lee intended to continue to employ him. But we cannot say, 
at the summary judgment stage, that no reasonable factfinder 
could find that this inference was plausible and that appellant 
made the inference at the time. See Anderson, 477 U.S. at 
249.8

__________
 8 Although appellant's contract would have expired by its terms 
on June 30, 1996 wholly apart from the May 14, 1996 termination 
decision, appellant had earlier been involved in negotiations with 
several of appellee's managers regarding a contract renewal. Ap-
pellant thus might reasonably have inferred from Gillette's state-


 III.

 Thus far we have discussed only appellant's retaliation 
claim. Appellant also asserted in his complaint a claim of 
hostile work environment sexual harassment, and did not 
carefully explain to the district court or to us how the finality 
and equitable estoppel arguments were applicable to his 
hostile environment theory.

 Here we can be brief. As with his retaliation claim, 
appellant was obliged to file an EEOC complaint within 180 
days of the "[precise] unlawful employment practice," Ricks, 
449 U.S. at 257, of which he complains. The last day on 
which he could have been subjected to hostile environment 
sexual harassment was his last day at work; thereafter he 
was not in a work environment, let alone a hostile one. See 
Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993); 
Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64-67 
(1986). Giving appellant the factual benefit of the doubt, the 
district court assumed his last day of work to be the day his 
contract expired, June 30, 1996. Counting from that date, 
appellant's EEOC complaint was filed 281 days later on 
March 28, 1997, which is too late.

 Appellant's finality and equitable estoppel arguments are 
inapposite to his hostile environment claim. Gillette's assur-
ance that O'Brien's termination decision was not a final 
determination goes only to the allegedly retaliatory termi-
nation--the hostile environment occurred, and appellant had 
notice of it, when he was at work. Similarly, Gillette's 
misleadingly optimistic statements suggesting that appellant 
would be rehired could not have been misleading as to 
appellee's position toward the hostile environment allegedly 
created by O'Brien. Those statements could only lull appel-
lant into believing that his retaliation claim would be remed-
ied, not into believing that the already experienced harm from 
the episodes of hostile environment sexual harassment would 
somehow be cured. Accordingly, the district court correctly 

__________
ments that, in addition to the grievance being resolved in his favor, 
a new contract was on the horizon.

granted summary judgment in favor of appellee on the hostile 
environment claim.

 * * * *

 For the foregoing reasons, the district court's decision to 
grant summary judgment to appellee is reversed on appel-
lant's retaliation claim and affirmed on appellant's hostile 
work environment claim.

 So ordered.