SYSTEMS COUNCIL EM–3, International Brotherhood of Electrical Workers, AFL–CIO, et al., Appellants,

v.

AT&T CORPORATION, et al., Appellees,

No. 97–7155.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1998.

Decided Nov. 24, 1998.

Kent Cprek argued the cause for appellants. With him on the briefs were Richard B. Sigmond and Thomas H. Kohn.

Joseph R. Guerra argued the cause for appellees. With him on the brief were Paul J. Zidlicky, Laura A. Kaster, T. Jay Thompson, Robert N. Eccles, Peter O. Shinevar and Karen M. Wahle.

Michael S. Horne, John M. Vine and Caroline M. Brown were on the brief for amicus curiae Erisa Industry Committee.

Before: EDWARDS, Chief Judge, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

EDWARDS, Chief Judge:

In 1995, pursuant to a corporate reorganization, AT&T Corporation ("AT&T") transferred its equipment business to Lucent Technologies, Inc. ("Lucent"). AT&T and Lucent subsequently entered into arrangements to separate their businesses; one such arrangement was embodied in an Employee Benefits Agreement ("EBA"). Under the EBA, AT&T amended its pension and welfare plans to divide the assets and liabilities of AT&T's defined plans and to provide for the continuation of existing defined benefits for both AT&T and Lucent retirees and employees. The appellants in this case—beneficiaries of the plans and their unions—seek to overturn AT&T's amendments of the pension and welfare plans. In broad terms, appellants contend that AT&T rigged the allocation procedures so that by the time Lucent becomes responsible for the retirement benefits owed to its former AT&T employees, it might not have enough money to provide for them. Appellants claim that AT&T's actions violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, and also resulted in a breach of contract.

We agree with the District Court that AT&T is not subject to ERISA's strict fiduciary standards, because it was not acting in a fiduciary capacity when it allocated pension and welfare plan assets and liabilities between AT&T and Lucent. We also agree that appellants have failed to state a claim under § 208 of ERISA, which protects the beneficiaries of spun-off plans. See 29 U.S.C. § 1058 (1994). Finally, it is clear that appellants' contract claims are not ripe for review. Accordingly, we affirm.

I. BACKGROUND

The facts of this case have been comprehensively detailed in an excellent opinion by the District Court, see Systems Council EM–

*3 v. AT&T Corp.,* 972 F.Supp. 21, 24–26 (D.D.C.1997), and bear no repetition here. Therefore, this Background section is quite brief and will serve only to provide a context for our analysis.

In 1995, AT&T decided to reorganize its corporate structure by spinning off operations into separate, publicly-traded businesses, one of which was Lucent. This case primarily concerns the EBA between AT&T and Lucent, which governs the allocation of employee pension and welfare plan assets and liabilities between AT&T and Lucent. *See id.* at 25–26. The EBA, which was signed on February 1, 1996, requires AT&T to calculate, for each AT&T and Lucent plan, an amount based on the funding policy historically used by AT&T to ensure adequate funding of employee benefit plans, employing the same actuarial assumptions used to determine minimum funding under ERISA and the Internal Revenue Code. Once the calculation is made, appropriate amounts are allocated to each fund. The EBA then allocates any residual (surplus) plan assets equally between AT&T and Lucent. *See id.* at 26.

Appellants filed the instant lawsuit on May 17, 1996, before AT&T had actually allocated any assets to Lucent. Although they had no data to support their claims, appellants' complaint in District Court was premised on the assumption that the EBA's prescribed methodology for the asset distribution unjustly favored AT&T. Alleging that AT&T acted in a fiduciary capacity with respect to the plan assets, appellants claimed that AT&T unlawfully favored itself in the allocation of those assets, in violation of the ERISA provisions that govern fiduciary responsibilities. *See* 29 U.S.C. §§ 1104, 1106(b) (1994 & Supp. II 1996). Appellants further alleged four separate violations of § 208, ERISA's non-fiduciary provision for the transfer of pension plan assets in a spin-off situation. First, appellants asserted that § 208 requires that the EBA provide for the division of any residual pension plan assets on a pro rata basis, rather than equally between the two entities. Second, appellants contended that the EBA's actuarial assumptions are not "reasonable," as required by the applicable Treasury regulations. Third, appellants protested that the

EBA does not guarantee appellants the benefit of any market earnings on the plan assets during the interim period between AT&T's divestment of Lucent stock and the actual segregation of AT&T's assets. Finally, appellants alleged that the EBA does not account for possible future adverse business experiences that Lucent may suffer, rendering the company unable to meet its employee benefit obligations. Appellants also claimed that AT&T's signing of the EBA amounts to a breach of AT&T's agreement to provide pension and welfare plan benefits to its employees, because the EBA assigns to Lucent the obligation to provide those benefits.

The District Court granted AT&T's motion to dismiss. Emphasizing that "[r]hetorical or emotional arguments voicing fears about the future ... simply cannot substitute for rigorous analysis of the pertinent statutory provisions," the District Court held that appellants had failed to state any claim upon which relief could be granted. *See Systems Council,* 972 F.Supp. at 27. This appeal followed.

## II. ANALYSIS

### A. *Standard of Review*

We review *de novo* the District Court's dismissal of appellants' claims under Rule 12(b)(6). *See Taylor v. FDIC,* 132 F.3d 753, 761 (D.C.Cir.1997). "Dismissal under Rule 12(b)(6) is proper when, taking the material allegations of the complaint as admitted and construing them in plaintiffs' favor, the court finds that the plaintiffs have failed to allege all the material elements of their cause of action." *Id.* (citations omitted).

### B. *Union Standing*

We need not decide whether the union appellants have standing to bring these ERISA claims. *See Systems Council,* 972 F.Supp. at 27–28 (holding that unions do not have standing to bring civil actions under ERISA). It is undisputed that the named plan beneficiaries have standing, *see* 29 U.S.C. § 1132(a)(1) (1994), and we may therefore reach the merits of their claims regardless of whether the unions have standing. *Cf. Craig v. Boren,* 429 U.S. 190, 192–

93, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (deciding case on merits where one appellant had standing but the other did not).

## C. Fiduciary Claims

ERISA § 3(21)(A) defines fiduciary, in relevant part, as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (1994). This definition applies to the entire subchapter, including the ERISA provisions on which appellants' claims are based. See 29 U.S.C. § 1002.

■■■ It cannot be seriously disputed that, under ERISA, AT&T, as an employer and a plan administrator, is subject to ERISA's fiduciary standards only when it acts in a fiduciary capacity. See, e.g., Maniace v. Commerce Bank, 40 F.3d 264, 267 (8th Cir.1994). The issue in this case is whether AT&T acted in a fiduciary capacity when it amended its pension and welfare plans and allocated the assets and liabilities of those plans between AT&T and Lucent. The District Court found, and we agree, that appellants have failed to state a legally cognizable claim under ERISA's fiduciary provisions, because there has been no showing that AT&T acted in a fiduciary capacity in taking the actions at issue in this case.

In Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), the Court held that when employers "adopt, modify, or terminate welfare plans," they are not acting in a fiduciary capacity. The Court subsequently expanded the rule of Curtiss-Wright in Lockheed Corp. v. Spink, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). In Lockheed, the employer, Lockheed, amended its pension plan to provide financial incentives for employees to retire early and release all employment-related claims against the company. These increased pension benefits were to be paid out of the plan's surplus assets. See id. at 885, 116 S.Ct. 1783. The employees brought suit, alleging that Lockheed had violated its fiduciary duties under ERISA because it was using plan assets—the surplus—to purchase a benefit for itself—early retirement and the release of claims. See id. at 886, 116 S.Ct. 1783. The Court foreclosed the employees' fiduciary claims, however, holding that "the act of amending a pension plan does not trigger ERISA's fiduciary provisions." Id. at 891, 116 S.Ct. 1783. The Court noted that when employers amend or modify any type of employee benefit plan, even pension plans, "they do not act as fiduciaries but [rather] are analogous to the settlors of a trust." Id. at 890, 116 S.Ct. 1783 (citation omitted). In other words, changing the design of a trust does not involve the kind of discretionary administration that typically triggers fiduciary responsibilities. See Sengpiel v. B.F. Goodrich Co., 156 F.3d 660, 666–67 (6th Cir. 1998). This rule, according to the Court, "is rooted in the text of [§ 3(21)(A) ]." Lockheed, 517 U.S. at 890, 116 S.Ct. 1783. Although appellants urge us to consider the extensive common law of trusts in determining whether AT&T acted as a settlor or as a fiduciary when it amended its pension plans, the Lockheed Court's interpretation of § 3(21)(A) is dispositive.

Appellants further argue that Lockheed stands only for the unremarkable proposition that the power to name the beneficiaries and define the benefits and liabilities of a trust is a settlor, not a fiduciary, power. We disagree. The plan design at issue in Lockheed involved far more than simply defining the trust; it involved the actual allocation of a portion of the trust corpus in a manner that presumably benefitted Lockheed. Indeed, it was the contention of the employees in Lockheed that the amendments to the pension plan "constituted a use of Plan assets to 'purchase' a significant benefit for Lockheed." Id. at 886, 116 S.Ct. 1783 (quoting Spink v. Lockheed Corp., 60 F.3d 616, 624 (9th Cir.1995)) (emphasis added). Thus, contrary to appellants' narrow reading of Lockheed, the District Court was correct in stating that the case clarifies the "distinction between those actions creating, altering or

terminating a trust, which are deemed settlor functions, and those actions managing and administering the investment and use of the trust assets, which are deemed fiduciary functions." *Systems Council,* 972 F.Supp. at 30.

Under *Lockheed,* it is clear that AT&T was not acting as a fiduciary when it amended its pension and welfare plans under the EBA. Appellants' complaint in this case is quite similar to that of the employees in *Lockheed*: the employer has allocated the assets of its pension and welfare plans in a manner that allegedly benefits the employer to the employees' detriment. While such an allocation might in some circumstances violate certain ERISA provisions—such as § 208, discussed below—under *Lockheed,* it does not implicate the statute's fiduciary provisions.

### D.  Section 208 Claims

Congress provided for the protection of spun-off employees in § 208, which mandates that plan assets may not be transferred to another plan "unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the ... transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the ... transfer (if the plan had then terminated)." 29 U.S.C. § 1058. Appellants have alleged four distinct violations of § 208.

#### 1.  Residual Assets

Section 208 essentially requires the employer to contemplate a hypothetical plan termination, take a "snapshot" of the benefits each participant of the plan would receive in the event of a termination, and then provide the aggregate present value of these benefits to the spun-off plan. Section 4044 governs the allocation of any residual plan assets in the event of actual termination of a plan. *See* 29 U.S.C. § 1344(d)(3) (1994).

Appellants point out that, under § 4044 and applicable regulations, if the pension plans at issue had actually terminated immediately prior to the spin-off, appellants would have been entitled to a pro rata share of any residual assets. *See* 29 C.F.R.

§ 2618.32(a) (1995). The EBA, on the other hand, provides for the equal division—between AT&T and Lucent—of any residual assets. *See Systems Council,* 972 F.Supp. at 26. Appellants claim that, in giving Lucent "only" an equal share of any residual assets, the EBA violates § 208 because the Lucent plans are entitled to a pro rata share of such assets under § 4044.

Appellants' position finds no support in the case law. Section 208 requires only that *benefits* payable upon *hypothetical* termination be no less after than before the spin-off, and creates no entitlement to residual *assets* that might be available upon *actual* termination of a plan. *See, e.g., Brillinger v. General Elec. Co.,* 130 F.3d 61 (2d Cir.1997), *petition for cert. filed,* 66 U.S.L.W. 3758 (U.S. May 13, 1998) (No. 97–1834); *Malia v. General Elec. Co.,* 23 F.3d 828 (3d Cir.1994). The District Court cited with approval the Third Circuit's opinion in *Malia,* which, after examining § 4044 and the accompanying regulations, concluded that, because both explicitly distinguished "benefits" from "assets," appellants were wrong to equate the two terms for the purposes of § 208. *See Malia,* 23 F.3d at 832 ("[The] language of [§ 4044] demonstrates clearly that 'benefits' are elements that are conceptualized and treated differently in a plan termination than are the 'assets' of that plan."); *Brillinger,* 130 F.3d at 63 ("Since [§ 208] deals with the level of benefits, the reasonable interpretation of that section is that it refers to those portions of [§ 4044] regarding the level of benefits, rather than the part about distributing residual assets."). We join these courts in holding that § 208, by its plain language, ensures only that plan beneficiaries receive the same level of *benefits* after the spin-off that they would have received prior to the spin-off, and does not create an entitlement to the residual assets that might be available upon actual termination of the plan. *See Brillinger,* 130 F.3d at 63 ("The fact that upon actual liquidation a participant may be entitled to receive some distribution of residual assets does not change the amount to be received as a 'benefit' [under § 208].").

We also note that the plans at issue in this case are *defined benefit plans,* as op-

posed to defined contribution plans. Under a defined contribution plan, each participant has an individual account; the level of benefits that he or she receives depends upon the performance of the assets retained in that individual account. *See Von Aulock v. Smith,* 720 F.2d 176, 177–78 (D.C.Cir.1983). In contrast, under a defined benefit plan, the employee is entitled to a fixed period payment upon retirement regardless of the performance of the underlying assets. *See id.* at 178. If the assets do not perform well, the employer must make up the difference. If they perform better than expected, however, the employees still may claim no more than the promised pension benefits under the plan. *See Johnson v. Georgia–Pacific Corp.,* 19 F.3d 1184, 1186 (7th Cir.1994). Thus, "[p]articipants in a defined benefit plan are not entitled to increases in benefits because successful investment causes assets to grow to be greater than liabilities. There is nothing in [ERISA] to the effect that such growth in assets will cause an increase in benefits payable to participants at the time of a [spin-off]." *Brillinger,* 130 F.3d at 64. In short, AT&T must transfer to Lucent only those assets that are necessary to fulfill the new plans' defined benefit obligations.

### 2. Actuarial Assumptions

■ In order to determine the level of funding necessary to provide for benefits pursuant to § 208, employers use actuarial assumptions. The applicable Treasury regulation mandates that these assumptions be "reasonable," and provides that "[t]he assumptions used by the Pension Benefit Guaranty Corporation [PBGC] ... are deemed reasonable for this purpose." 26 C.F.R. § 1.414(*l*)-1(b)(5)(ii) (1998). As the District Court correctly observed, this regulation does not mandate the use of the PBGC assumptions, but rather cites them as a "safe harbor." *Systems Council,* 972 F.Supp. at 35; *cf. Securities Indus. Ass'n v. Board of Governors,* 807 F.2d 1052, 1064 (D.C.Cir. 1986) (noncompliance with optional "safe harbor" securities regulation does not foreclose compliance with the statute).

The EBA does not employ the PBGC assumptions. Rather, it provides that AT&T must use the actuarial assumptions that it currently uses to determine the minimum funding requirements for its plans under ERISA. *See Systems Council,* 972 F.Supp. at 26. By law, these assumptions are required to be reasonable. *See* 26 U.S.C. § 412(c)(3)(A)(i) (1994). Before the District Court, appellants complained that "[t]here is no indication" that the assumptions provided for in the EBA are reasonable. Complaint ¶ 43(d), *reprinted in* Joint Appendix ("J.A.") 1041. On appeal, appellants argue that, in order to comply with the reasonableness requirement, an employer must either use the "standardized PBGC assumptions" or "obtain an actual commercial annuity quote at the relevant calculation date." Brief of Appellants at 30; *see also* Complaint ¶ 40, *reprinted in* J.A. 1039.

The District Court correctly dismissed appellants' claims. *See Systems Council,* 972 F.Supp. at 35–36. For one thing, appellants cite no case or Treasury regulation supporting the propositions they advance. Moreover, considering the reasonableness of an actuarial assumption in a different context, the Supreme Court has noted that the "nature of the beast" is such that there may be several "equally correct approaches" to actuarial practice. *Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust,* 508 U.S. 602, 635–36, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (citation and internal quotation marks omitted). Appellants' complaint never explains why they think the EBA's prescribed approach is unreasonable. *See* Complaint ¶¶ 40–43, *reprinted in* J.A. 1039–41.

■ The salient point here is that, because they filed their lawsuit before they had any idea how much of AT&T's plan assets would be transferred to Lucent, appellants were in no position even to claim that the EBA's actuarial assumptions were unreasonable. *See Systems Council,* 972 F.Supp. at 36 n. 24 (noting that without any knowledge of the specifics of the proposed allocation, appellants could not allege unreasonableness without risking Rule 11 sanctions). Subsequent to the commencement of this litigation, AT&T actually allocated its assets to Lucent and the specific details of the allocation are now publicly available. AT&T and Lucent

employees now know how much money was transferred to the Lucent plans, how many employees were transferred to Lucent, and the demographics of those employees. Knowledge of each of these factors is crucial in determining whether the actuarial assumptions used in the allocation were reasonable. If plan beneficiaries *now* have a good faith basis for challenging AT&T's actuarial assumptions, they may consider filing suit under § 208. However, prior to the actual allocation, when they knew only that the EBA did not provide for the use of the PBGC assumptions or a commercial annuity quote, appellants were in no position to state a viable claim under § 208.

### 3. Asset Valuation During the "Interim" Period

Under the EBA, Lucent was to remain under the control of AT&T until all of the common stock of Lucent owned by AT&T was distributed to individual AT&T stockholders. *See Systems Council*, 972 F.Supp. at 25–26. Because the actual segregation of AT&T's assets did not occur on the exact date that the Lucent stock was distributed to the individual stockholders, the EBA provided for an adjustment "as of the date of the actual segregation by AT&T to the extent necessary or appropriate to reasonably and appropriately reflect additional" gains made by the pension assets during the interim period between the stock distribution and the actual segregation. EBA § 3.2(b)(iii), *reprinted in* J.A.2027. Appellants allege that this provision does not guarantee them the "benefit of actual market earnings" on the assets during the interim period. Brief of Appellants at 24.

■ Because the plans at issue are defined benefit plans, however, the participants are not entitled under ERISA to the benefit of any interim increase in the value of the assets. As discussed above, participants in a defined benefit plan are entitled only to the level of benefits promised them under the plan. Thus, the District Court was correct in holding that appellants "have no ownership interest in the assets of the plan, and the amount transferred must only be sufficient to provide 'benefit equivalence' after the trans-

fer." *Systems Council*, 972 F.Supp. at 37 (quoting *John Blair Communications, Inc. v. Telemundo Group, Inc.*, 26 F.3d 360, 367 (2d Cir.1994)). This conclusion is in accord with decisions from other circuits that have considered the issue. *See, e.g., John Blair*, 26 F.3d at 366–67; *Bigger v. American Commercial Lines, Inc.*, 862 F.2d 1341, 1348 (8th Cir.1988). Indeed, under a defined benefit plan, it is virtually irrelevant whether the interim gains are transferred to Lucent; as the Second Circuit explained in *John Blair*, "it would matter little to the individual [participants] whether the plan lost out on [the interim gains] as long as those members were guaranteed their promised benefits at retirement." *John Blair*, 26 F.3d at 366.

### 4. Future Benefits

■ Appellants' final claim under § 208 merits little attention. Appellants contend that the EBA violates ERISA because future adverse business experiences may render Lucent unable to fund its plans as well as AT&T has been funding them. But by its plain language, § 208 mandates transfer of assets sufficient to provide, "immediately after" the spin-off, the level of benefits each participant would receive "immediately before" the spin-off. 29 U.S.C. § 1058. Nothing in ERISA compels the original employer to fund the non-vested, future benefits of spun-off employees. *See Bigger*, 862 F.2d at 1345 ("A sponsor of an original defined benefit plan ... has no duty to guarantee that the sponsor of a spunoff plan will pay spunoff employee benefits earned in the future."). Accordingly, the District Court properly dismissed this claim. *See Systems Council*, 972 F.Supp. at 38.

### E. Contract Claims

■ Appellants also raised common law contract claims. Specifically, they allege that they relied upon AT&T's promises to provide them pension and welfare plan benefits, and that Lucent might not be able to make good on those promises. The District Court properly dismissed these claims as unripe. *See Systems Council*, 972 F.Supp. at 38–40.

First, appellants contend that the EBA absolves AT&T of liability "in the event that

Lucent is unable to provide [the welfare] benefits now or in the future." Complaint ¶ 58, *reprinted in* J.A. 1046. This claim is hardly fit for review, however, given that no participant in the welfare plan has alleged that Lucent has been unwilling or unable to provide the benefits it is obligated to provide. The District Court correctly determined that a declaratory judgment stating the extent of AT&T's liability in the event of a Lucent breach would violate Article III's requirement that a current case or controversy between the parties exist. *See Systems Council,* 972 F.Supp. at 39; *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 81, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *United Steelworkers of America, Local 2116 v. Cyclops Corp.,* 860 F.2d 189, 194–96 (6th Cir.1988) (holding, in a virtually identical situation, that claims of pension plan participants were unripe).

[redacted] Second, appellants rely on a misguided application of a fundamental contract law doctrine. They claim that their contract claims are ripe because AT&T, in assigning its welfare plan obligations to Lucent, "clearly has disclaimed and repudiated" those obligations. Brief of Appellants at 38. It is true that, if a performing party unequivocally signifies its intent to breach a contract, the other party may seek damages immediately under the doctrine of anticipatory repudiation. *See Jankins v. TDC Management Corp.,* 21 F.3d 436, 443 (D.C.Cir.1994). However, AT&T has not repudiated anything; it has simply assigned its welfare plan obligations to Lucent. Absent a provision in the plans prohibiting such assignment, the action does not constitute an anticipatory breach.

## III. Conclusion

For the reasons stated above, we affirm the judgment of the District Court.

*So ordered.*