**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEFFREY H. BECK, Liquidating
Trustee of the Estates of Crown
Vantage, Inc. and Crown Paper
Company,
                    *Appellant,*

                v.

PACE INTERNATIONAL UNION, on
behalf of member and former
member participants in pension
plans sponsored by the Debtors;
EDWARD MILLER; JEFFREY D.
MACEK, on behalf of themselves
and others similarly situated,
            *Defendants-Appellees.*

No. 03-15303

D.C. No.
CV-02-01407-MHP

PACE INTERNATIONAL UNION, AFL-
CIO, CHEMICAL & ENERGY
WORKERS INTERNATIONAL UNION, on
behalf of members and former
member participants in pension
plans,
            *Defendant-Appellant,*

                v.

JEFFREY H. BECK, Liquidating
Trustee of the Estates of Crown
Vantage, Inc. and Crown Paper
Company,
                    *Appellee.*

No. 03-15331

D.C. No.
CV-02-01407-MHP

OPINION

14631

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, District Judge, Presiding

Argued and Submitted
November 4, 2004—San Francisco, California

Filed October 24, 2005

Before: Stephen Reinhardt, Richard A. Paez, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Paez

## COUNSEL

Stephen A. Kroft (argued), Rodger M. Landau, Los Angeles, California, for the appellant/cross-appellee.

John Plotz (argued), Christian L. Raisner, Oakland, California, for the appellees/cross-appellant.

## OPINION

PAEZ, Circuit Judge:

In the course of Chapter 11 liquidation proceedings, debtors Crown Vantage, Inc. and Crown Paper Co. (Crown) decided to terminate Crown's pension plans through the purchase of an annuity, rather than by merging the plans into a multiemployer plan sponsored by PACE International Union (PACE). Plan participants and PACE filed an adversary action against Crown in bankruptcy court, alleging that Crown's directors breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 (ERISA), as amended, 29 U.S.C. §§ 1001-1461, by failing to consider adequately the proposed merger. The bankruptcy court agreed and issued a preliminary injunction ordering that Crown maintain the residual assets — approximately $5 million — in the plan in an interest-bearing account pending a final decision on the allocation of the assets. Pursuant to the bankruptcy court's order, the parties submitted a joint plan for the distribution of the residual assets for the benefit of the plan participants and stipulated that the court's ruling on the preliminary injunction could be treated as a final ruling on the merits

under Federal Rule of Civil Procedure 65(a)(2). The bankruptcy court approved the plan.

As in the bankruptcy and district courts, Crown[1] argues that it did not breach its fiduciary duties to plan participants and beneficiaries because merger into a multiemployer plan is an impermissible means of terminating a pension plan under ERISA, its implementing regulations, and the terms of the pension plan. PACE cross-appeals the district court's determination that it lacked standing to pursue an appeal.

We have jurisdiction pursuant to 28 U.S.C. § 158(d). We hold that under ERISA and its regulations, merger into a multiemployer plan is not a prohibited means of terminating a pension plan, and that the bankruptcy court did not err in concluding that Crown breached its fiduciary duties by failing to consider thoroughly PACE's proposal and discharge its duties "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). With respect to PACE's cross-appeal, we vacate the district court's judgment on that issue with directions to remand to the bankruptcy court for further proceedings.[2]

## I.   Facts and Procedural History

Crown Vantage, Inc. was the parent company of Crown Paper Co., which operated seven paper mills in the Eastern United States and employed 2600 workers. The employees were covered by collective bargaining agreements with PACE. Members of Crown's board of directors were also the trustees for its eighteen pension plans.

---

[1]Appellant Jeffrey H. Beck is the liquidating trustee of the Crown estates. Because the actions of Crown's board of directors, the trustees of the pension plans, are the focus of this action, however, we refer to Crown as the appellant.

[2]In a separate memorandum disposition filed today, we address the remedy imposed by the bankruptcy court.

In March of 2000, Crown filed for Chapter 11 bankruptcy and began liquidating its assets. *See generally In re Crown Vantage, Inc.,* 421 F.3d 963, 967-68 (9th Cir. 2005). The Pension Benefit Guarantee Corporation (PBGC) filed proofs of claims totaling millions of dollars for the liability it would have been forced to assume if it had taken over Crown's pension plans. The bankruptcy court viewed PBGC's proofs of claims as a "stumbling block" to Chapter 11 plan confirmation. In July of 2001, Crown's board began to obtain quotes for the purchase of an annuity as a means of effecting a "standard termination" of the plans under Section 4041(b) of ERISA, 29 U.S.C. § 1341(b).

During the summer of 2001, PACE proposed a merger of the seventeen pension plans that covered Crown's hourly employees into the PACE Industrial Union Management Pension Fund (PIUMPF), a Taft-Hartley Act multiemployer pension fund founded in 1963 for PACE union members. PACE preferred this option because PIUMPF in prior years had paid a thirteenth monthly check during the year, and thus merger offered the possibility that retirees might receive more than the minimum benefits. Additionally, PACE preferred the proposed merger because PIUMPF provided an established dispute resolution program for plan participants.

Crown's counsel met with a PACE representative in August of 2001 to discuss the merger, and expressed the view that Crown wanted to be assured of the financial stability of PIUMPF and the legality of the merger. The parties agreed that their attorneys and actuaries would further investigate the PIUMPF merger. On September 26, 2001, PIUMPF's actuary reported that the merger was feasible, and Crown's counsel requested more information from PIUMPF's counsel. That same day, Crown's board of directors met and reviewed bids for annuities, and learned that a "reversion" to the company of remaining assets in the plan would be possible if it terminated twelve of the pension plans through the purchase of an

annuity.[3] The board also learned about the proposed PIUMPF merger, and agreed to compare it to the annuity options once it received final bids.

On October 1, 2001, PIUMPF's counsel sent Crown's counsel a draft merger agreement. On October 4, Crown's counsel stated at a hearing in the bankruptcy court that it was looking into the possibility of a merger with PIUMPF. At this hearing, counsel represented that "before an action is taken as to these pension plans," the court would be notified. On October 8, PIUMPF's counsel sent Crown more information about the financial stability and legality of the merger.

Crown's board met on October 9, 2001, to review the final annuity bids with the understanding that they would expire within twenty-four hours. The bankruptcy court determined that the board did not seek a waiver of this deadline. At the time of the meeting, the board faced a forty-five day timetable for dissolving Crown, and Crown had $10,000 or less in the bank. The board did not consider the PIUMPF merger at this meeting, and it did not ask its actuary to analyze the proposed merger. Minutes of the October 9 meeting reflect that PBGC had agreed to release Crown under an annuitization of the pension plans, but not in a merger. The bankruptcy court found that the board did not pursue a release from PBGC for a merger with PIUMPF. The board decided to purchase an annuity as a means of terminating the twelve merged pension plans (the Merged Plan) through Hartford Life Insurance Company, on the basis of Hartford's financial stability and a projected maximum reversion of nearly $5 million to Crown. Crown deposited over $84 million with Hartford the next day.

---

[3]The twelve plans were identified because they were "overfunded" and would therefore yield a surplus after the annuity had been purchased. Crown merged these twelve plans into one "Merged Plan" in order to purchase the annuity. The remaining five pension plans covering hourly workers were to remain the responsibility of Georgia Pacific Company, the successor to a prior plan sponsor.

Appellees Edward Miller and Jeffrey Macek, on behalf of themselves and other similarly situated plan participants, and PACE, on behalf of its members and former member plan participants, filed suit in bankruptcy court. The plaintiffs alleged that Crown breached its fiduciary duties under ERISA by failing to "perform a diligent investigation into the PIUMPF [merger] proposal," and by failing to discharge its duties "solely in the interest of the participants and beneficiaries." After rendering oral findings of facts and conclusions of law, the bankruptcy court granted a preliminary injunction, ordering all cash assets remaining in the pension plan to be placed in an interest-bearing account, and that no reversion of assets to Crown could occur, pending the court's final decision on the allocation of the assets. The bankruptcy court also ordered the parties to report on the feasibility of distributing the reversion "for the benefit of the pension plan participants." Although the plaintiffs asked the bankruptcy court to void the annuity transaction with Hartford, the court declined to do so and allowed Crown to complete the termination process.

The parties stipulated to having the bankruptcy court's findings of fact and conclusions of law deemed a final ruling on the merits, and submitted a joint report setting forth a procedure for distribution of the residual assets for the benefit of the plan participants. The bankruptcy court entered an order approving the distribution of the assets to the plan participants. As noted, the court left the preliminary injunction in effect pending implementation of the distribution. Although no final judgment was entered, in light of the parties' stipulation we treat the district's order granting the preliminary injunction as the final judgment.

On appeal to the district court, Crown argued that neither appellees Miller and Macek nor PACE had standing and that it was neither subject to fiduciary obligations in terminating the plan, nor did it breach such duties. The district court held that appellees Miller and Macek had standing as plan partici-

pants to enforce Crown's fiduciary obligations, but dismissed PACE for lack of standing, because it was not an enumerated party under ERISA.[4] The district court affirmed the bankruptcy court's determination that Crown breached its fiduciary duties as well as the preliminary injunction granted by the bankruptcy court.

## II.   Breach of Fiduciary Duties under ERISA

The parties do not dispute that the decision to terminate a pension plan is a business decision not subject to ERISA's fiduciary obligations, *see Cunha v. Ward Foods, Inc.*, 804 F.2d 1418, 1432-33 (9th Cir. 1986), and *Amalgamated Clothing and Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1419 (9th Cir. 1988), whereas the *implementation* of a decision to terminate is discretionary in nature and subject to ERISA's fiduciary obligations. *See Waller v. Blue Cross of Cal.*, 32 F.3d 1337, 1342-44 (9th Cir. 1994). Crown does not challenge the bankruptcy court's finding that it failed fully to investigate the PIUMPF merger option. Instead, Crown argues that both ERISA and the terms of the pension plan prohibit merger into a multiemployer plan as a means of termination; thus its decision to terminate, rather than to merge, was discretionary and not subject to fiduciary obligations. The merits of Miller and Macek's claim that Crown breached its fiduciary duties therefore turn on whether merger into a multiemployer plan is a permissible means of implementing a decision to terminate.

### A.   Standard of Review

We review the bankruptcy court's decision directly and therefore review de novo the district court's decision on appeal from the bankruptcy court. *Cellular 101*, *Inc. v. Chan-*

---

[4]Crown now concedes that appellees Miller and Macek have standing. We address the issue of cross-appellant PACE's standing in Section III of this opinion.

*nel Communications, Inc. (In re Cellular 101, Inc.)*, 377 F.3d 1092, 1095 (9th Cir. 2004); *Neilson v. United States (In re Olshan)*, 356 F.3d 1078, 1083 (9th Cir. 2004). We apply the same standard of review applied by the district court, and review the bankruptcy court's legal conclusions de novo, and its findings of fact for clear error. *Olshan*, 356 F.3d at 1083.

## B. Permissibility of Merger under the Terms of the Pension Plan

**[1]** Before the district court and in this appeal, Crown has argued that the terms of its pension plan do not permit a merger as a means of termination. Crown failed to raise this argument before the bankruptcy court. As a general rule, we do not consider issues argued for the first time on appeal. *Citibank (S.D.), W.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1085 n.2 (9th Cir. 1996). This rule applies to appeals from bankruptcy proceedings. *In re Southland Supply, Inc.*, 657 F.2d 1076, 1079 (9th Cir. 1981). We conclude that none of our recognized exceptions to this rule applies to this case. *Cf. Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004); *Eashai*, 87 F.3d at 1085 n.2. We therefore deem this argument waived.

## C. Permissibility of Merger as a Means of Termination under ERISA

The bankruptcy court did not explicitly determine whether ERISA permits merger into a multiemployer plan as a means of terminating a single employer plan. Instead, the court assumed that this was permissible, finding "[t]he decision whether to annuitize the plans or merge them into PIUMPF was . . . a discretionary act" subject to fiduciary duties. Because the bankruptcy court's interpretation of ERISA is a question of law, our review is de novo. *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1178 (9th Cir. 2004); *Olshan*, 356 F.3d at 1083.

**[2]** As Crown argues, ERISA § 4041(a)(1), 29 U.S.C. § 1341(a)(1), provides that the exclusive means of terminating a single-employer pension plan are: 1) institution of termination proceedings by the corporation under 29 U.S.C. § 1342; 2) standard termination under § 1341(b); and 3) distress termination under § 1341(c). The termination effected in this case was a standard termination. A standard termination requires that, "when the final distribution of assets occurs, the plan is sufficient for benefit liabilities." 29 U.S.C. § 1341(b)(1)(D). So long as the PBGC does not issue a notice of noncompliance, the plan administrator must distribute the assets. *Id.* § 1341(b)(2)(D); 29 C.F.R. §§ 4041.21(a), 4041.28(a), (c).

**[3]** ERISA § 4041(b)(3), 29 U.S.C. § 1341(b)(3), sets forth the method for "final distribution of assets" for standard terminations. The assets are to be allocated according to the priorities listed in 29 U.S.C. § 1344. Next, the statutory section at issue in this case states:

> In distributing such assets, the plan administrator shall—
>
> (i) purchase irrevocable commitments from an insurer to provide all benefit liabilities under the plan, *or*
>
> (ii) in accordance with the provisions of the plan and any applicable regulations, *otherwise fully provide all benefit liabilities under the plan.*

§ 1341(b)(3)(A) (emphasis added). Thus, ERISA explicitly provides for alternative means of terminating a pension plan. The implementing regulations are consistent:

> The plan administrator must, in accordance with all applicable requirements under the Code and ERISA, distribute plan assets in satisfaction of all plan bene-

fits by purchase of an irrevocable commitment from an insurer *or in another permitted form.*

29 C.F.R. § 4041.28(c)(1) (emphasis added). Thus, the purchase of an irrevocable commitment from an insurer is not a requirement; other methods of termination are permitted as long as they are sufficient to cover plan liabilities.

**[4]** Crown emphasizes that ERISA § 4041, 29 U.S.C. § 1341, and ERISA § 4232, 29 U.S.C. § 1412, which controls transfers between multiemployer and single-employer plans, are two "wholly separate sections of the statute," neither of which expressly permits mergers as a means of termination. Yet, as the district court persuasively reasoned, both 29 U.S.C. §§ 1341 and 1412 are included within ERISA Title IV, which covers the topic of "Plan Termination Insurance." Section 1412 falls under Subtitle E of Title IV, "Special Provisions for Multiemployer Plans." It would have been logical for Congress to place § 1412 within Title IV of ERISA because, as appellees Miller and Macek argue, one practical effect of a merger or complete transfer is that at least one pension plan will cease to exist.

**[5]** Crown cites *Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Co.*, 331 U.S. 519, 528-29 (1947), and *Scarborough v. Office of Personnel Management*, 723 F.2d 801, 811 (11th Cir. 1984), for the proposition that a statute's titles and headings cannot "limit the plain meaning of the text." Those cases, however, dealt with *unambiguous* statutory language. By contrast, where the statutory language is *ambiguous*, titles and headings may be used to clarify the meaning of statutory text. *See Natural Res. Def. Council v. EPA*, 915 F.2d 1314, 1321 (9th Cir. 1990). Here, the statutory language is unclear: whether Congress intended to permit mergers into multiemployer plans as a means of termination under 29 U.S.C. § 1341(b)(3)(A) is uncertain. Consideration of the placement of titles and headings clarifies the statutory

text and supports the conclusion that mergers are a permissible means of termination.

Crown also argues that 29 U.S.C. § 1412(f)(3), which involves transfers between or mergers of multiemployer and single-employer plans, supports its argument that terminations are distinct from transfers between single and multiemployer plans. Section 1412(f)(3) states:

> No transfer to which this section applies, in connection with a termination described in section 1341a(a)(2) of this title, shall be effective unless the transfer meets such requirements as may be established by the corporation to prevent an increase in the risk of loss to the corporation.

Section 1341a refers to terminations of multiemployer plans. The text of § 1412(f)(3) implies that a transfer between a single and multiemployer plan can be "in connection with a termination" (albeit the termination of a multiemployer plan). Thus, § 1412(f)(3) fails to support Crown's argument that termination and merger into a multiemployer plan are mutually-exclusive actions.

Finally, Crown argues that a merger into a multiemployer plan does not constitute a "distribution" under 29 U.S.C. § 1341(b)(3). The terms "distribution" or "distribute" are not expressly defined in either ERISA or its implementing regulations. *See* 29 U.S.C. §§ 1002, 1301; 29 C.F.R. § 4041.2. Dictionary definitions of "distribute" include: "to divide among several or many: deal out; apportion esp. to members of a group or over a period of time: allot"; "dispense, administer"; and "to give out or deliver esp. to the members of a group." WEBSTER'S THIRD NEW INT'L DICTIONARY (1993). These definitions do not support the exclusion of mergers into multiemployer plans as a means of termination. As appellees Miller and Macek argue, the purchase of irrevocable commitments from an insurer to provide all benefit liabilities under the plan,

pursuant to 29 U.S.C. § 1341(b)(3), such as the annuity to be provided by Hartford Life in this case, does not appear to satisfy the distribution requirement any more than would a merger into a multiemployer plan. Both scenarios would involve a series of payments to plan beneficiaries over time, rather than a lump-sum payment at the time of termination.

**[5]** In sum, the text of ERISA § 4041 and its implementing regulations is ambiguous at best and neither explicitly nor implicitly prohibits merger into a multiemployer plan as a means of termination of a pension plan. As the district court determined, § 1341(b)(3) provides for alternative means of termination, so long as they are consistent with the plan provisions, applicable regulations and "otherwise fully provide all benefit liabilities under the plan." We hold that neither the statute nor its implementing regulations preclude mergers into multiemployer plans as a method of providing such benefit liabilities. We therefore affirm the district court's ruling on this issue.

### D.   Merits of Breach of Fiduciary Duty Claim

Applying the test for a preliminary injunction, the bankruptcy court found serious questions as to whether Crown breached its fiduciary duties to plan participants by failing fully to investigate the proposed PIUMPF merger. As previously noted, because the parties stipulated to having the bankruptcy court's findings of fact and conclusions of law deemed a final ruling on the merits, we review the merits determination de novo. *Stratosphere Litig. L.L.C. v. Grand Casinos, Inc.*, 298 F.3d 1137, 1142 (9th Cir. 2002). Crown has never argued that it fairly considered the PIUMPF proposal, instead staking its defense on the argument that merger into a multiemployer plan is an impermissible means of termination.

**[6]** ERISA requires fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries" and for the exclusive purposes of "(i) providing benefits to

participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). ERISA's "exclusive benefit" rule provides that, except in certain circumstances,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

§ 1103(c)(1); *Resolution Trust Corp. v. Fin. Insts. Ret. Fund*, 71 F.3d 1553, 1556-58 (10th Cir. 1995). Corporate officers and directors often "serve in a dual fiduciary capacity," with simultaneous duties running both to pensioners, in their capacity as plan trustees, and to shareholders, as directors of the corporation. *See Friend v. Sanwa Bank Cal.*, 35 F.3d 466, 468-69 (9th Cir. 1994); *Donovan v. Bierwith*, 680 F.2d 263, 271 (2d Cir. 1982). Conflicts of interest created by these dual roles can lead to violations of ERISA's loyalty requirements. *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1401-02 (9th Cir. 1995). We have stressed that where such conflicts arise, "decisions must be made with an eye single to the interests of the participants and beneficiaries." *Id.* at 1402 (quoting *Donovan*, 680 F.2d at 271). Furthermore, "fiduciaries may need to step aside, at least temporarily, from the management of assets where they face potentially conflicting interests." *Id.* at 1402 (quoting *Leigh v. Engle*, 727 F.2d 113, 125 (7th Cir. 1984)); *see also Waller*, 32 F.3d at 1341-44 (holding that plaintiff stated an ERISA claim for breach of fiduciary duty where it alleged fiduciary imprudently based the choice of an annuity provider on the size of a potential reversion).

The bankruptcy court found "that there are serious questions whether the conduct of Crown's officers and Board of Directors was directed more at fulfilling their fiduciary obligations to the creditors of an insolvent corporation than at ful-

filling their fiduciary obligations to the corporation's pensioners." The court applied the standard set forth in *Leigh*:

> Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries.

727 F.2d at 125-26. The bankruptcy court determined that, whether motivated by the possibility of a reversion, Crown's "desperate financial circumstances," or the certainty of obtaining a release from the PBGC under an annuity option, Crown failed to make the requisite "intensive and scrupulous" investigation of investment options, including the proposed PIUMPF merger.

**[7]** Crown's fiduciary obligation was to assure the payment of the promised defined benefits with as little risk of nonpayment as possible, not to use the fund's total assets to the beneficiaries' optimum benefit. *See generally Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440 (1999) ("Since a decline in the value of a plan's assets does not alter accrued benefits, members similarly have no entitlement to share in a plan's surplus . . . ."); *cf. Collins v. Pension & Ins. Comm. of the S. Cal. Rock Prods. & Ready Mixed Concrete Ass'ns*, 144 F.3d 1279, 1282 (9th Cir. 1998) ("ERISA does not create an exclusive duty to maximize pecuniary benefits."). The bankruptcy court alluded to this limited obligation in stating that "[h]ad there been no prospect of a merger with another plan, then the Board's course of conduct almost surely would have passed muster." As the ERISA statute provides for reversions, *see* 29 U.S.C. § 1344, it can be permissible, depending on the governing plan's terms, for trustees to choose a termination option that provides for a reversion as long as the process employed is for the exclusive purpose of acting in the beneficiaries' interest. In making a decision among possible termination schemes, however, the reversion should not be taken

into account, even to a minor extent, pursuant to the "eye single" principle of fiduciary responsibility to the beneficiaries. *See Pilkington*, 72 F.3d at 1401-02.

In *Pilkington*, plaintiffs alleged that pension trustees breached their fiduciary duty by choosing an annuity provider on the basis of the size of the potential reversion. *Id.* at 1401-02. Defendants chose the lowest bidder, which resulted in the largest reversion, and the annuity provider defaulted shortly thereafter. *Id.* at 1397-98. In response to the defendants' argument that they chose an AAA or A+ rated annuity, we stated that "a mere ratings scan" does not satisfy a pension trustee's fiduciary duties. *Id.* at 1401. On the basis of "strong evidence that reversion maximization figured prominently" in the choice and that the trustees' "motivation may have deviated from that mandated by ERISA," we reversed a grant of summary judgment in favor of defendant trustees. *Id.*

As in *Pilkington*, the possibility of a reversion appears to have featured in the minds of the Crown trustees. The bankruptcy court, relying on *Pilkington*, stated that "the prospect of a reversion" was one of several possible factors that, individually or combined, "strongly suggests that the officers and directors of Crown did not make the 'intensive and scrupulous investigation of the plan's investment options' that the circumstances required particularly given their dual fiduciary capacity." The court concluded that "once the merger option was raised, the Board had a fiduciary duty to fully explore it and determine which option was truly in the beneficiaries' best interests. The fact that the company was out of cash and had a timetable for plan confirmation should have played no part in the determination.

**[8]** We agree with the bankruptcy court that there is evidence that the fiduciaries' "motivation may have deviated" from the "eye single" focus on the interests of plan beneficiaries, as mandated by ERISA. *See id.* at 1401-02 (quoting *Donovan*, 680 F.2d at 271). The risk to fund assets resulted from

Crown's focus on an improper set of interests. *See Leigh*, 727 F.2d at 125 (stating that "[u]nder the section 404(a) duty of loyalty, the central question is whether the fiduciaries acted solely in the interests of the beneficiaries and for the exclusive purpose of providing them with benefits."). The bankruptcy court found evidence of divided loyalties and that Crown failed adequately to discharge its duties through thorough investigation. We conclude that the bankruptcy court did not err in determining that Crown breached its fiduciary duties by failing exclusively to prioritize the interests of plan participants and beneficiaries and failing to make the "intensive and scrupulous investigation of the plan's investment options." *See Leigh*, 727 F.2d at 125-26. We therefore affirm the district court's determination on this issue.

## III.   Standing

The district court held that PACE lacked standing on the ground that ERISA § 502(a), 29 U.S.C. § 1132(a), confers exclusive enforcement authority on plan participants, beneficiaries, fiduciaries, employers, states, and the Secretary of Labor. It further held that PACE lacked standing under ERISA § 4070, 29 U.S.C. § 1370(a), which confers standing on unions to enforce the termination procedures of ERISA, because its complaint did not allege that Crown violated the termination provisions of ERISA § 4041, 29 U.S.C. § 1341.[5] We review the district court's determination of standing de novo. *Porter v. Jones*, 319 F.3d 483, 489 (9th Cir. 2003).

---

[5]Although Crown did not raise the issue of PACE's standing before the bankruptcy court, the district court addressed the issue on jurisdictional grounds, citing *Pershing Park Villas Homeowners Association v. United Pacific Insurance Company*, 219 F.3d 895, 899 (9th Cir. 2000) (noting that "[b]ecause issues of constitutional standing are jurisdictional, they must be addressed whenever raised," whereas "objections to nonconstitutional standing not properly raised before the district court" may be waived), and *Curtis v. Nevada Bonding Corporation*, 53 F.3d 1023, 1027 (9th Cir. 1995) (reiterating that "a plaintiff's standing under [ ] § 1132(a)(1) is a prerequisite to ERISA jurisdiction.").

On cross-appeal, PACE argues that, in light of liberal notice pleading rules, the district court should have construed its complaint broadly to include allegations that Crown violated the termination provisions of ERISA § 4041. Alternatively, PACE requests leave to amend its complaint to include such allegations.

Crown does not contest the district court's determination that plaintiffs Miller and Macek have standing. Crown contends that we need not address whether PACE has standing because the appeal will proceed regardless of whether PACE is a party. *See Sys. Council EM-3 v. AT&T Corp.*, 159 F.3d 1376, 1378-79 (D.C. Cir. 1998) (declining to decide whether union had standing to bring ERISA claims in light of plan beneficiaries' standing) (citing *Craig v. Boren*, 429 U.S. 190, 192-93 (1976)). As an entity that collectively bargains for pension rights, however, PACE has institutional resources and experience to enforce ERISA, and it may be in a better position to protect the rights of all of its members. We conclude that, despite the fact that this litigation may proceed on the basis of Miller and Macek's standing, the presence or absence of PACE as a party remains a relevant issue.

**[9]** Pursuant to ERISA § 4070, 29 U.S.C. § 1370, unions have standing to seek equitable relief for violations of ERISA §§ 4041, 4042, 4062-64, and 4069, 29 U.S.C. §§ 1341, 1342, 1362-64, 1369, which relate to termination procedures. The district court held that because PACE's complaint failed to state claims under ERISA §§ 4041, 4042, 4062-64, or 4069 for improper termination by Crown, and because the issue in this action is whether Crown breached its fiduciary duties, PACE did not have standing under § 4070.

**[10]** PACE's first amended complaint did not explicitly allege violations of the termination procedures. Instead, it focused on Crown's breaches of fiduciary duty in failing adequately to consider the PIUMPF merger. PACE argues that there is a fiduciary duty overlay that permeates ERISA, and

thus § 4070 provides a union with standing to enforce a breach of such duties in the context of plan termination. PACE requests that we grant it leave to amend its complaint to allege violations of ERISA's termination procedures, thus bringing it within the grant of standing for unions in § 4070. Because both parties should have the opportunity to address this issue, we remand to the bankruptcy court so that it may consider in the first instance PACE's request to file an amended complaint and its new theory of standing. *See United Union of Roofers, Waterproofers and Allied Trades No. 40 v. Ins. Corp. of Am.*, 919 F.2d 1398, 1402 (9th Cir. 1990) (remanding for determination of union's new theory of standing).

## IV. Conclusion

[11] We hold that merger into a multiemployer plan is a permissible means of terminating a pension plan under ERISA. We further hold that the bankruptcy court did not err in concluding that the Crown board breached its fiduciary duties by failing adequately to consider the PIUMPF merger and in order to prioritize the interests of plan participants and beneficiaries. We therefore affirm the district court's ruling on these issues. Finally, we vacate the district court's determination that PACE lacks standing, grant PACE's request for leave to amend its complaint to better articulate the basis for its standing, and remand the standing issue to the district court with instructions to remand to the bankruptcy court.[6]

---

[6]The appellees/cross-appellant have filed two requests for judicial notice in this court. In the first request, filed on February 16, 2004, appellees/cross-appellant ask that we take judicial notice of Crown's motion for order authorizing the Liquidating Trustee to pay an adjustment premium to the Hartford Life Insurance Company, the bankruptcy court's order granting this motion, and appellees/cross-appellant's notice of appeal. In the second request, filed on June 7, 2004, appellees/cross-appellant request that we take judicial notice of PACE's First Amended Petition to Compel Arbitration and Complaint for Breach of the Terms of Collective Bargaining Agreements, filed in the bankruptcy court on Octo-

**AFFIRMED in part; VACATED in part; and REMANDED.**

---

ber 2, 2002, and the transcript of a January 22, 2003 petition to compel arbitration. Appellees/cross-appellant have not adequately explained why these documents are relevant or on what grounds this court should take judicial notice of them. We therefore deny these requests.